Thomas P. KEATING, Jr., Plaintiff,

v.

BBDO INTERNATIONAL, INC., Tom Dillon, James J. Jordan, Jr., Bruce E. Crawford, E. E. Norris, Clayton Huff and Raymond E. McGovern, Defendants.

No. 76 Civ. 5691 (GLG).

United States District Court,
S. D. New York.

July 28, 1977.

McHugh, Heckman, Smith & Leonard, New York City, for plaintiff, Martin J. McHugh, Robert P. Whelan, New York City, of counsel.

Rogers & Wells, New York City, for defendants, James J. Maloney, Betty B. Robbins, New York City, of counsel.

## OPINION

GOETTEL, District Judge.

The complaint herein alleges five causes of action. The first is brought under Section 10(b) of the Securities Exchange Act of 1934, 15 U.S.C.A. § 78j(b) and Rule 10b–5,

17 C.F.R. § 240.10b–5, and the four others, respectively, allege breach of implied covenant in a stockholder's agreement, common law fraud, "intentional infliction of temporal damage to plaintiff without excuse or justification," and wanton, willful and malicious conduct toward plaintiff warranting an award of punitive damages. All claims arise from the same operative facts and constitute an exhaustive effort to find a sustainable cause of action therein. In response, defendants have moved to dismiss under Rule 12(b)(6) of the Federal Rules of Civil Procedure for failure to state a claim upon which relief may be granted.

Defendant, BBDO International, Inc. ("BBDO"), is an advertising firm incorporated under the laws of the State of New York. Defendants, Tom Dillon, James J. Jordan, Jr., Bruce E. Crawford, E. E. Norris, Clayton Huff and Raymond E. McGovern, are the corporation's six directors. Plaintiff, Thomas B. Keating, Jr., had been employed by the company for upwards of twenty years and had accumulated 1800 shares of stock in the corporation pursuant to an employee stock option incentive plan. All such stockholders were required to become parties to a written agreement initially executed in 1949 which prohibited any sale or transfer of BBDO stock except to the company, and the company, in turn, was required to repurchase the stock upon the death, resignation, retirement or discharge or any employee holding stock. Neither the purchase price nor the reacquisition price contained an allowance for the current good will of the business.

Keating had no employment contract with BBDO and, although he was employed from 1952 through 1972, he served at the pleasure of his employer. The controversy herein arises out of the circumstances of his discharge, which occurred about a year and one-half prior to the date on which BBDO made a public stock offering. Had plaintiff been with the company when it made its public offering, the value of his shares would have increased almost three-fold. The undisputed facts and circumstances of Keating's discharge and BBDO's decision to go public are as follows:

BBDO is one of the largest advertising agencies in the world and yet was a closely-held corporation up until November 24, 1973 when its stock was offered for sale to the public. Plaintiff had served the company, as one of its many vice-presidents, since 1963 and was also a group supervisor directly responsible for certain accounts. In early 1971, plaintiff was assigned to one Joseph Henrici, who was a vice-president and management supervisor of BBDO. At that time, Keating was entrusted with the New York State Department of Commerce, Chevron East, and Remington Arms accounts which had a collective billing of $3.8 million from which BBDO realized a profit of $600,000

Around July of 1971, Henrici assigned Keating to the DuPont Textiles Fibres account. Almost simultaneously, the New York State account left BBDO for another agency. (Keating claims that he had been contacted by the commissioner of the department and had been assured that the switch was entirely for political reasons.)

Shortly thereafter, DuPont notified BBDO of an internal reorganization and requested a parallel reorganization at BBDO so that accounts formerly segregated by department were consolidated into one account. Keating claims that he recommended his own removal from the account because he felt it was in the best interests of the company under the circumstances.

In early 1972, Chevron requested that plaintiff be replaced because it was dissatisfied with his performance. BBDO, in response to the wishes of its client, assigned another employee to the account.

This left Keating with but one client—Remington. It was imperative at this time that the company secure further assignments for Keating since one account was insufficient to occupy his time fully. Bayard Pope, director of internal operations, was responsible for insuring that employees were carrying a sufficient work load and was, therefore, notified of the plaintiff's unfortunate situation. Pope attempted to

find new assignments but was unsuccessful and, in view of unsatisfactory reports received from Henrici, decided to discharge Keating. Plaintiff maintains that he, himself, had considered leaving BBDO because of the status of his accounts but had held off because he was due to retire shortly and, more importantly, because he had heard that the company might go public.

In early March, at a meeting with Pope, Keating expressed a willingness to work at a reduced salary since loss of salary would be insignificant compared to the gain he would realize if company stock was sold on the open market. However, Pope ruled out any possibility of continued employment. According to plaintiff, Pope maintained that plans for going public were indefinite and, in any event, participation in a future public sale would be limited to those stockholder-employees with a future in BBDO. Pope thereafter notified Keating that his official termination date would be May 31, 1972. Upon termination, Keating received vacation pay and seventeen weeks severance based upon the company's plan.

Keating maintains that all during this period prior to his severance he had heard rumors of the possibility of BBDO going public. In fact, some general statements to that effect had been made by management at the annual stockholder's meeting in February, 1972. Defendants' undisputed assertions in this respect are more explicit. According to Raymond E. McGovern, a defendant and general counsel to BBDO, the company had contemplated a public sale as early as 1969 but declined to follow through because market conditions were unfavorable. In 1972, Merrill, Lynch, Pierce, Fenner & Smith, Inc. were retained as investment counselors and, again, advised that a public offering was presently undesirable. Rogers & Wells, a law firm, was subsequently approached for its advice and, as late as February 14, 1972, the proposition lacked approval. McGovern maintains that no firm commitment was made until June 15, 1972 when BBDO retained Dean Witter & Co. as underwriters for a proposed public offering. At the same time, a registration statement was prepared for submission to the Securities and Exchange Commission. The Board of Directors had authorized the amendment of the stockholder's agreement of 1949 and the calling of a special shareholders' meeting to approve such changes. That special meeting was held on June 27, 1972 and the shareholders voted to amend the agreement to suspend BBDO's rights to exercise any option to repurchase shares until November 1, 1973, or until such date, if earlier, that a public offering of its stock was made.

Prior to the June 27th meeting, BBDO called all exercisable options. This was a necessity since failure to do so would have permitted public sale of the stock which, in turn, would violate the company's policy of employee ownership before the public sale was a fact.

On August 23, 1972 BBDO filed with the Securities and Exchange Commission. However, then present plans for the proposed offering were abandoned and on December 22nd of that year the registration statement was withdrawn. In September, 1973 another registration statement was filed with the Securities and Exchange Commission and, finally, on November 24, 1973, 705,515 shares of BBDO capital stock was marketed at $18 per share.

Defendants, apparently recognizing the antipathy in this circuit to summary judgment procedures, seek to have the motion considered as a motion to dismiss. However, since the papers submitted by the parties are accompanied by affidavits seeking to support their respective positions, defendants' motion may be considered a motion for summary judgment, rather than one pursuant to Rule 12(b)(6) of the Federal Rules, since matters outside the pleadings are "presented to and not excluded by the court." *Evans v. McDonnell Aircraft Corp.*, 395 F.2d 359, 361 (8th Cir. 1968); *Gager v. "Bob Seidel,"* 112 U.S.App.D.C. 135, 300 F.2d 727 (D.C.Cir.), *cert. denied*, 370 U.S. 959, 82 S.Ct. 1612, 8 L.Ed.2d 825 (1962); *Hirsch v. Archer-Daniels-Midland Co.*, 258 F.2d 44 (2d Cir. 1958); *Klein v. Spear, Leeds & Kellogg*, 306 F.Supp. 743, 745 n.1 (S.D.N.Y.1969). Furthermore, there is am-

ple authority for the proposition that once the court decides to accept extra-pleading material, it *must* convert the 12(b)(6) motion into a Rule 56 motion. *Carter v. Stanton*, 405 U.S. 669, 92 S.Ct. 1232, 31 L.Ed.2d 569 (1972); *Hammond v. United States*, 388 F.Supp. 928 (E.D.N.Y.1975); *Baynes v. Ossakow*, 336 F.Supp. 386 (E.D.N.Y.1972); *Ringling Bros., Inc. v. Chandris American Lines, Inc.*, 321 F.Supp. 707 (S.D.N.Y.1971). It is inconsequential that the moving party has not sought summary judgment since the determinative consideration is the sufficiency of the pleader's claim as supported by the extra-pleading material. 5 Wright & Miller, *Federal Practice and Procedure* : Civil § 1366 (1969); *Kaufman v. Scanlon*, 245 F.Supp. 352 (E.D.N.Y.1965); *O'Neill v. Maytag*, 230 F.Supp. 235 (S.D.N.Y.), *aff'd*, 339 F.2d 764 (2d Cir. 1964).

■ Because the burden of demonstrating that no genuine issue exists as to any material fact is on the movant, *Adickes v. Kress & Co.*, 398 U.S. 144, 157, 90 S.Ct. 1598, 26 L.Ed.2d 142 (1970); *First National Bank of Cincinnati v. Pepper*, 454 F.2d 626 (2d Cir. 1972); *Society of New York Hospital v. Associated Hospital Service of New York*, 367 F.Supp. 149 (S.D.N.Y.1973); *Franklin National Bank v. L. B. Meadows & Co.*, 318 F.Supp. 1339 (E.D.N.Y.1970), the evidence must be viewed in a light most favorable to the opposing party and he must be accorded the benefit of all propitious inferences. *United States v. Diebold, Inc.*, 369 U.S. 654, 655, 82 S.Ct. 993, 8 L.Ed.2d 176 (1962); *Sterling National Bank & Trust Co. of New York v. Fidelity Mortgage Investors*, 510 F.2d 870 (2d Cir. 1975); *United States v. J. B. Williams Co.*, 498 F.2d 414 (2d Cir. 1974). Consequently, the court has accepted as true the factual allegations in plaintiff's affidavit.

■ Rule 56(c) provides that summary judgment may be granted on a motion "if the pleadings, depositions, answers to interrogatories and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." According

to Professor Wright, there is a tendency to approach summary judgment requirements too stringently, in a manner not in keeping with the spirit of Rule 56.

It is frequently said that summary judgment should not be granted if there is the "slightest doubt" as to the facts. Such statements are a rather misleading gloss on a rule that speaks in terms of "genuine issue as to any material fact," and would, if taken literally, mean that there could hardly ever be a summary judgment, for at least a slight doubt can be developed as to practically all things human. A better formulation would be that the party opposing the motion is to be given the benefit of all reasonable doubts in determining whether a genuine issue exists.

C. Wright, *Law of Federal Courts*, 493–94 (3d ed 1976). Of course, the bottom line is that a court cannot try issues of fact on a motion for summary judgment, but may only determine whether there are issues to be tried. *Heyman v. Commerce and Industry Insurance Co.*, 524 F.2d 1317, 1319–20 (2d Cir. 1975); *Cali v. Eastern Airlines, Inc.*, 442 F.2d 65, 71 (2d Cir. 1971); *American Manufacturers Mutual Insurance Co. v. American Broadcasting-Paramount Theatres, Inc.*, 388 F.2d 272, 279 (2d Cir. 1967).

■ The danger involved in ruling on a motion for summary judgment is the temptation to treat the extra-pleading materials as all the evidence that could possibly be produced in a given case and to make subconscious judgments on the quality of proof instead of simply determining whether a factual issue exists.

Although summary judgment under Fed. R.Civ.P. 56 can be a valuable tool for disposing of vexatious litigation and promoting prompt disposition of cases . . . it must be used selectively if we are to avoid trial by affidavit.

*Judge v. City of Buffalo*, 524 F.2d 1321, 1322 (2d Cir. 1975).

■ Plaintiff, however, does not raise any material facts requiring adjudication or discovery. The essential facts are undisputed. On a motion for summary judgment

the court should not avoid deciding legal issues using as a refuge phantom issues of fact. *See American Manufacturers Mutual Insurance Co. v. American Broadcasting-Paramount Theatres*, 388 F.2d 272, 278 (2d Cir. 1967); *Empire Electronics Co. v. United States*, 311 F.2d 175, 179 (2d Cir. 1962); *Greyhound Corp. v. Excess Insurance Co. of America*, 233 F.2d 630, 636 (5th Cir. 1956).

■ Plaintiff initially contends that he was the victim of knowing, deceitful conduct—that defendants failed to disclose material information about going public and that such omission was manipulative and deceptive within the meaning of Section 10(b) of the Securities and Exchange Act of 1934. However, Keating was obligated to sell his shares back to the company upon the termination of his employment. This was mandated contractually pursuant to the shareholder's agreement he had entered into upon exercising his first option to purchase stock.[1] Even viewing the facts and circumstances presented in the affidavits in a light most favorable to plaintiff, it is clear that what he did or did not know is irrelevant. When his employment terminated he had to sell his stock to the company even if the date for public offering was known and fixed. The case of *Ryan v. J. Walter Thompson Co.*, 453 F.2d 444 (2d Cir. 1971), involved a similar factual situation. Plaintiff Ryan, a vice-president and director of defendant advertising agency, had retired from the company in 1966 and the company exercised its option to purchase his stock in 1969 pursuant to buy-back restrictions on the shares contained in the certificate of incorporation. The company went public six months later and the value of the stock was enhanced considerably. Ryan brought

an action to rescind the sale of his shares to the company and, as one ground, alleged failure to disclose material information with respect to the public offering in violation of the Securities and Exchange Act of 1934. The Second Circuit affirmed the district court determination that the contractual obligation was paramount and the failure by defendant to disclose its plans was of no consequence whatsoever. In its per curiam decision, the panel rendered the following reprimand:

> This case is another example of a trend we have observed with disturbing frequency, namely, invocation of the salutary anti-fraud provisions of the federal securities laws in cases where those provisions are wholly inappropriate and wide of the Congressional mark.

453 F.2d at 445.

Plaintiff here seeks to distinguish *Ryan* since, there, restrictions on transferability were contained in the certificate of incorporation while, here, the restriction is contained in a shareholder's agreement. This argument begs the issue. The point is that, in any event, plaintiff was obligated contractually to sell back his shares to the corporation upon the exercise of its option to repurchase after plaintiff had been discharged from employment. The case of *Fershtman v. Schectman*, 450 F.2d 1357 (2d Cir. 1971), *cert. denied*, 405 U.S. 1066, 92 S.Ct. 1500, 31 L.Ed.2d 796 (1972), is not inapposite as plaintiff contends, and is clearly in accord with *Ryan* as the recent district court holding in *Weissman v. Smoler Brothers, Inc.*, Fed.Sec.L.Rep. (CCH) ¶ 95,878 (S.D.N.Y. Feb. 22, 1977) demonstrates.

1. Paragraph 1 of the Stockholder's Agreement dated February 26, 1949 provides:

> In event a Stockholder who, at the time, is an employee or officer of the Corporation, dies, or is discharged, he or his executors or administrators must forthwith tender and offer, and they and each of them shall be deemed to have forthwith offered for sale to the Corporation the shares of stock then registered in the Stockholder's name; and the Corporation, within ninety (90) days thereafter must buy the shares of a stockholder who

> shall have died or shall have retired permanently from business or shall have been discharged and the Corporation shall have the right and option within ninety (90) days thereafter to purchase the shares of a Stockholder who shall have resigned for any reason other than to retire permanently from business all on the terms for payment and other conditions hereinafter set forth and at a price determined in the manner hereinafter described.

*Fershtman* involved a provision in a partnership agreement which allowed the general partners to buy out the limited partners at any time. After the venture had proved highly successful, the general partners elected to terminate the limited partnership and returned the balance of the capital contributions made by them. Nine of the forty-seven limited partners brought an action under the Securities and Exchange Acts of 1933 and 1934 alleging misrepresentation and non-disclosures by defendants both in connection with plaintiffs' initial purchases and the resale at the termination of the partnership. The language of the court's holding is particularly appropriate to the case herein:

> With respect to the [purported "forced sale"], if defendants were legally entitled to terminate the partnership . . . in their sole discretion, it would make no difference what they misrepresented or concealed, even if we assume in plaintiff's favor that this transaction constituted a sale.

450 F.2d at 1360.

*Weissman v. Smoler Brothers, Inc., supra,* cited both *Ryan* and *Fershtman* as well as *Blackett v. Clinton E. Frank, Inc.,* 379 F.Supp. 941 (N.D.Ill.1974), in dismissing a claim brought under Rule 10b–5 because plaintiff was contractually obligated to sell his securities back to the corporation upon termination of his employment. The court held that any ostensible misrepresentations or omissions with respect to the value of his stock were not determinative of the outcome of plaintiff's claims.

It is clear, therefore, that even if defendants had wrongfully withheld certain pertinent information with respect to the public offering, as plaintiff alleges, it is of no moment. The company was exercising an option pursuant to a contractual right in accordance with an established corporate policy concerning employee ownership of stock. Plaintiff does not dispute that defendants had a right to discharge him since he was employed at the pleasure of his employer. If that discharge was proper, it is difficult to envision how there can be any objection to the stock repurchase.

■ Realizing this, plaintiff argues that employment termination is one thing, but such discharge coupled with serious economic harm which could have been avoided is quite another. In other words, the corporation owed plaintiff some sort of fiduciary duty not to exercise the option as explicitly set forth in the stockholder's agreement because it would be injurious to him. The fallacy of this proposition is immediately apparent and the authority cited in support of it, *Parker v. Borock,* 5 N.Y.2d 156, 182 N.Y.S.2d 577, 156 N.E.2d 297 (1959), is inappropriate. In fact, *Parker,* along with *Town & Country House & Home Service, Inc. v. Newbery,* 3 N.Y.2d 554, 561, 170 N.Y.S.2d 328, 334, 147 N.E.2d 724, 728 (1958), and, *Walford v. British Caledonian Airways,* 52 A.D.2d 922, 383 N.Y.S.2d 401 (2d Dep't 1976), support defendants' position that Keating's employment was terminable at will by either party without notice, since he was employed pursuant to an oral agreement for an indefinite period.[2]

When plaintiff purchased his stock, he did so with the understanding that, if he was dismissed from employment for any reason, he would be required to sell back his stock to the corporation. This was plainly mandated by the stockholder's agreement and the parties were dealing at arm's length. Plaintiff also understood from the outset of his career with BBDO that his employment was terminable at will. Certainly, the corporation was under no duty, fiduciary or otherwise, to procure further work assignments for plaintiff when his accounts dwindled or to keep him on until there was a public offering. Defendant is

---

2. Even though he would have been well within his rights, Pope was not so callous as to dismiss Keating after twenty years' service without notice. Plaintiff readily admits that he received more than a month's notice of termination and was given the use of his office and a telephone to be used as his personal base of operations for several months after his dismissal. In addition, Keating received the maximum severance pay allowable under the agreement between him and the company.

correct in asserting that plaintiff's proposition, i. e., that the corporation should have continued his employment so that he could benefit financially, is an astonishing legal assertion.

■ While it is not entirely clear whether plaintiff is alleging breach of contract in the repurchase of stock pursuant to the shareholder's agreement at book value, rather than at market value, if plaintiff so contends, the argument undoubtedly fails. *Allen v. Biltmore Tissue Corp.*, 2 N.Y.2d 534, 161 N.Y.S.2d 418, 141 N.E.2d 812 (1957). In any event, there is no implied covenant in the stockholder's agreement that could have been breached.

■ Keating's third cause of action, a pendent jurisdiction claim, alleges common law fraud. (Plaintiff also avails himself of Section 352–c of the General Business Law of the State of New York in his memorandum of law.) It is futile to discuss the merits of this allegation for the same reasons discussed above. Whether or not the plaintiff had been defrauded because defendants failed to disclose plans for a public offering simply has no bearing on the outcome of this case because the stock buyback agreement was valid and enforceable and plaintiff's employment termination was lawful.

■ The fourth cause of action sounds in prima facie tort, i. e., the "intentional infliction of temporal damage" and is as shallow as the preceding three. In order to recover in an action for prima facie tort under New York law, plaintiff must allege defendants' specific intention to harm him. What has been alleged, in fact, is that defendants terminated plaintiff from employment in order to reacquire his corporate stock holdings for their own personal gain. This is a selfish motive and it does not indicate an affirmative intention to harm plaintiff. *Reinforce, Inc. v. Birney*, 308 N.Y. 164, 169, 124 N.E.2d 104, 106 (1954). Plaintiff alleges that he was purposefully discharged so that the corporation could recoup his stock and thereby realize a substantial gain when it was sold at the public

exchange. Yet, plaintiff was a minor shareholder of a relatively insignificant interest in BBDO. (Using Keating's own calculations, his holdings would have amounted to less than 4% of the issued stock at the time the corporation went public.) There is no claim or evidence that his discharge was part of a sweeping attempt by the majority shareholders to "squeeze out" the many minority interests. Plaintiff, himself, points to a conversation he had with an unidentified employee-stockholder who had been urged by his management supervisor to stay on, when he had contemplated resignation, because it was possible that the corporation might go public.

■ A second element of prima facie tort is special damages, which plaintiff has failed to allege. In his complaint, plaintiff claims he was wrongfully discharged and was, therefore, without employment for a period of time and deprived of income. This ought to yield a fairly exact figure, but the amount set forth by plaintiff is around $250,000. In any event, plaintiff states that he is not suing the defendants in their capacity as his employer since, in fact, some of the defendants were not his employer. Rather, the damages which he seeks are only with respect to the sale of stock to the corporation before it went public. The law of New York is clear that, in an action for prima facie tort, only those actual and special damages which are incurred as a result of lost employment are recoverable. *Morrison v. National Broadcasting Co.*, 19 N.Y.2d 453, 458, 280 N.Y. S.2d 641, 643–44, 227 N.E.2d 572, 574 (1967); *Bohm v. Holzberg*, 47 A.D.2d 764, 365 N.Y. S.2d 262, 264 (2d Dep't 1975); *Carnival Co. v. Metro–Goldwyn–Mayer, Inc.*, 23 A.D.2d 75, 78, 258 N.Y.S.2d 110, 113 (1st Dep't 1965). The complaint lacks such allegations.

Plaintiff's fifth cause of action incorporates, by reference, everything else in the complaint and then alleges that such acts constitute willful, wanton and malicious conduct "in utter disregard to the consequences to plaintiff," and he therefore claims that punitive damages are awarda-

ble. Since we have found that the first four causes are baseless, it is unnecessary to consider this final claim.

For the foregoing reasons, we are compelled to dismiss the complaint and grant summary judgment in favor of the defendants.

SO ORDERED.