Edith Shearn KERRIGAN, as Executor and Trustee and John K. Watson, Jr., as Successor Trustee in lieu of John K. Watson, Deceased Executor and Trustee under the Will of Arthur L. Kerrigan, Deceased, and Edith Shearn Kerrigan, Individually, Plaintiffs,

v.

MERRILL LYNCH, PIERCE, FENNER & SMITH, INCORPORATED, Donald T. Regan, George L. Shinn and Ned B. Ball, Defendants.

No. 76 Civ. 2197 (GLG).

United States District Court,
S. D. New York.

May 15, 1978.

As Amended May 22, 1978.

Forsyth, Decker, Murray & Hubbard, New York City, for plaintiffs; Samuel J. Murray, Barbara A. Mentz, New York City, of counsel.

Brown, Wood, Ivey, Mitchell & Petty, New York City, for defendants; Roger J. Hawke, New York City, of counsel.

## OPINION

GOETTEL, District Judge.

In this securities action, the defendants moved to dismiss for failure to state a claim upon which relief can be granted or, alternatively, for summary judgment. In response, the plaintiffs moved for leave to amend their complaint, in order to add several factual allegations and substantive claims. The defendants opposed the motion for leave to amend on several grounds, but primarily on the basis that the complaint if amended as proposed still fails to state a claim or is equally vulnerable to summary judgment.

Since all the defendants' arguments for dismissal of the original complaint may be considered against the complaint as amended, the Court granted plaintiffs' motion for purposes of deciding the merits of the defendants' motion to dismiss.[1] Because a decision of the motion to dismiss requires the aid of some materials outside of the pleadings, the motion is treated as one for summary judgment. Fed.Rs. Civ.P. 12(b)(6) & 56.

### I.

In 1970, the death of Arthur Kerrigan ended his participation in a corporation that was on the verge of a major financial achievement. His executors now challenge the right of that privately held corporation to exercise, upon his death, an option to repurchase his restricted shares when the company was preparing to capitalize on a public offering of its stock in 1971.

The amended complaint alleges three federal securities claims, with jurisdiction based on section 27 of the Securities Exchange Act of 1934 (1934 Act), 15 U.S.C. § 78aa. Seven claims grounded on state statutory and common law are alleged on the basis of pendent jurisdiction. The federal claims charge violations of sections 9 and 10(b) of the 1934 Act, 15 U.S.C. §§ 78i, 78j(b), and Rule 10b–5, 17 C.F.R. § 240.10b–5. The plaintiffs are the executors of the estate of Arthur Kerrigan, a former vice-president of Merrill Lynch, Pierce, Fenner & Smith, Inc. (Merrill Lynch). Mrs. Kerrigan also sues in her individual capacity. Generally, the plaintiffs assert that defendant Merrill Lynch and the named defendant directors of the company defrauded them in connection with the repurchase of Mr. Kerrigan's shares of Merrill Lynch upon his death in 1970.

As set out in the complaint, Mr. Kerrigan retired from Merrill Lynch in 1964. At that time, Merrill Lynch was a privately held corporation incorporated under Delaware law, and a member of the New York Stock Exchange. Pursuant to company policy and the corporate certificate, as a part of his retirement Kerrigan exchanged his shares of voting stock with the company and received a smaller number of non-voting, restricted shares. The restriction appeared plainly on the stock certificates. At the time of his retirement, Kerrigan also entered into an agreement with the company, in which he gave Merrill Lynch the right to repurchase his non-voting stock "at any time" for a "net book value" price per share. This agreement was a supplement to the provisions of article VI of the certificate of incorporation, which granted to the

---

1. Because of the Court's view of the merits of the amended complaint, it is not necessary to rule on the other various grounds raised by defendants in opposition to the motion for leave to file it.

company the option to repurchase such shares, under a net book value formula, upon the death of the shareholder.[2]

Kerrigan died on November 26, 1970, and on December 14th Merrill Lynch notified the executors that it would exercise the option to repurchase Kerrigan's 40,000 non-voting shares for the total net book value of $1,077,360. The transaction was completed in January of 1971.

The repurchase option granted by article VI of the certificate was in accord with Rule 313.21 of the New York Stock Exchange, which required a member company to repurchase the shares of any shareholder who died, so long as the shares were not freely transferable. Until 1970, the Exchange's policy required member companies to be closely held corporations whose shares were not publicly traded. On March 26, 1970, however, the exchange had amended its rules to permit member firms to issue tradable shares. Around that same time, Merrill Lynch had begun an investigation of "going public." A confidential study group allegedly recommended, on April 3, 1970, that the company undertake a public offering.

The complaint further alleges that on July 14th of that year, Merrill Lynch's directors approved the formation of a legal and accounting task force to conduct an audit of the firm in preparation for such an offering. The alleged plan of at least a few insiders called for a registered offering in March of 1971. Preparations proceeded during the fall and winter, and, finally, on April 8, 1971, the board of directors gave formal approval to the proposals. This decision was publicly announced on April 12th, and approved by the shareholders on April 20th. In June, the offering went forward, and the corporation's common stock was split three for one, all reclassified as voting stock and sold at the offering at $28 per share.

The preparations for the offering were allegedly kept strictly confidential by a few insiders, including the individual defendants. No mention of the plan was made at the annual shareholders' meeting in April of 1970, nor even to the executive committee of the board after the submission of the study group's report. The complaint alleges, however, that the decision to go public was in fact made by the insiders substantially before the exercise of the option to repurchase Kerrigan's shares.

The plaintiffs also state that there was no uniform company policy regarding the exercise of the options upon the death of a shareholder, and that there was a company policy which permitted some widows to retain or repurchase some of their husbands' shares after the company's repurchase. Such an offer was not made to Mrs. Kerrigan, and the complaint alleges that she was not informed of this company policy and was not aware of the alleged discriminatory manner in which it was carried out.

Finally, the complaint alleges that during this "twilight" period, when the plan for the public offering had been decided upon but not publicly disclosed, several insiders bought Merrill Lynch stock for their own accounts with the knowledge that the company would soon be making an offering. The complaint does not allege that any of Mr. Kerrigan's shares were brought by any of the insider traders. Rather, the corporation itself was the purchaser of Kerrigan's shares.

## II.

■ The primary claim advanced by the plaintiffs is that Merrill Lynch's decision to go public was made before the exercise of the repurchase option, and, consequently, defendants' failure to disclose the offering

---

**2.** Article VI, section 1(a) of the Merrill Lynch certificate of incorporation provided in part:

"[I]n the event of the death . . . of any holder of common stock of the corporation . . . the Corporation shall have the right and option which shall be prior to any other right and option, to purchase the shares of common stock of the Corporation held by deceased . . . ."

The option was enforceable for a period of 90 days from the date the corporation received notice of the death, or acknowledged notice of the death.

plan at that time was a violation of Rule 10b–5. The Court, of course, must view the factual allegations in the complaint as true and draw all inferences in favor of plaintiffs for purposes of deciding this motion. *Conley v. Gibson,* 355 U.S. 41, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957); see 2A Moore's Federal Practice ¶ 1209 (2d ed.1975).

While Rule 10b–5 is an important and flexible instrument of federal securities law, it is equally clear that it does not provide a remedy for every claim of improper corporate conduct. The Rule is designed in line with the essential scheme of most federal securities regulations to foster disclosure of material information to purchasers and sellers of securities in order to permit an informed investment decision by the investor. Disclosure is mandated for this reason, not for its own sake in the abstract.

■ Accordingly, one of the essential elements of a private 10b–5 claim is a showing of reliance or causation, *i. e.,* that the alleged deficiency in disclosure had some influence in the decision to buy or sell. This reliance concept is incorporated into the materiality requirement under the Rule to ensure that "the potentially limitless thrust of Rule 10b–5 [is restricted] to those situations in which there exists a causation in fact between the act and the injury." *Titan Group, Inc. v. Faggen,* 513 F.2d 234, 239 (2d Cir.), *cert. denied,* 423 U.S. 840, 96 S.Ct. 70, 46 L.Ed.2d 59 (1975). *See Shapiro v. Merrill, Lynch, Pierce, Fenner & Smith, Inc.,* 495 F.2d 228 (2d Cir. 1974).

■ Because affirmative proof of reliance on nondisclosure is a somewhat difficult concept, a logical inference of reliance is permitted upon a showing of materiality under objective standards. *Affiliated Ute Citizens v. United States,* 406 U.S. 128, 92 S.Ct. 1456, 31 L.Ed.2d 741 (1972). It is clear, however, that the objective test of materiality has not removed the requirement of some degree of causation in fact. For example, if a defendant can show that the investment decision by the plaintiff would not have changed under any circumstances, then the necessary causal link between the alleged nondisclosure and the decision to buy or sell is not present. *Titan Group, Inc. v. Faggen, supra; Rochez Brothers, Inc. v. Rhoades,* 491 F.2d 402 (3d Cir. 1974). Although proof of actual causation may not be required in all cases of statutory disclosure violations,[3] it is clear that in an individual, "face-to-face" transaction, some degree of causation in fact is required to ensure that the statutory purpose of disclosure will be furthered and that the defendant will not be held "liable to all the world." *Globus v. Law Research Service Inc.,* 418 F.2d 1276, 1292 (2d Cir. 1969), *cert. denied,* 397 U.S. 913, 90 S.Ct. 913, 25 L.Ed.2d 93 (1970). *See List v. Fashion Park, Inc.,* 340 F.2d 457 (2d Cir.), *cert. denied,* 382 U.S. 811, 86 S.Ct. 23, 15 L.Ed.2d 60 (1965). *See generally* R. Jennings & H. Marsh, *Securities Regulation* 1063–68 (1977).

In the instant case, the defendants argue that no matter what was known to plaintiffs in December of 1970, the company had a valid and enforceable right to repurchase Kerrigan's shares upon his death, and there was in fact no voluntary decision by plaintiffs to sell. The plaintiffs attempt to counter this argument by asserting that the exercise of the option was invalid under state law, and that they could have stopped it, and would have, if they had known of the imminent increase in the value of their stock. The plaintiffs do not contend that the option granted by article VI of the certificate of incorporation was per se illegal, or that the contract entered into by

**3.** In some cases, where the overall benefits of disclosure are important and further the statutory purposes of the 1934 Act, the ability of a defendant to show a lack of actual causation may not preclude recovery. *See, e. g., Schlick v. Penn-Dixie Cement Corp.,* 507 F.2d 374, 380–81 (2d Cir. 1974), *cert. denied,* 421 U.S. 976, 95 S.Ct. 1976, 44 L.Ed.2d 467 (1975) (ability of majority shareholder to approve transaction notwithstanding opposing votes by the minority does not defeat action challenging proxy violations). *See generally* R. Jennings & H. Marsh, *Securities Regulation* 1068 & n.19 (1977); Note, *The Reliance Requirement in Private Actions under SEC Rule 10b–5,* 88 Harv.L. Rev. 584 (1975).

Kerrigan with the company was in any way induced by fraud. Rather, they maintain that the exercise of the option in the circumstances of this case was invalid under state law and could have been successfully resisted.

Plaintiff draws some support for this causation theory from footnote 14 of the Supreme Court's opinion in *Santa Fe Industries, Inc. v. Green,* 430 U.S. 462, 474 n.14, 97 S.Ct. 1292, 1301, 51 L.Ed.2d 480 (1977). That case involved a 10b–5 challenge to a short-form merger, which under Delaware law required no advance notice to the minority shareholders. Commenting on a collateral claim raised by the plaintiff that pretransaction disclosure should have been made by the corporation to the minority, Justice White stated:

> "But respondents do not indicate how they might have acted differently had they had prior notice of the merger. Indeed, they accept the conclusion of both courts below that under Delaware law they could not have enjoined the merger because an appraisal proceeding is their sole remedy for any alleged unfairness in the terms of the merger. Thus the failure to give advance notice was not a material nondisclosure within the meaning of . . . the Rule."

*Id.* Plaintiffs here seize on the negative implication of this statement to the effect that if a state remedy existed which would have made disclosure meaningful, then the necessary materiality or causality might be present.

The Second Circuit, in *Goldberg v. Meridor,* 567 F.2d 209 (2d Cir. 1977), *cert. denied,* 434 U.S. 1069, 98 S.Ct. 1249, 55 L.Ed.2d 771 (U. S. Feb. 21, 1978), has discussed this concept of materiality based on alleged state law remedies, and at least in the context of derivative actions challenging trans-

actions by a majority with a conflict of interest, has exhibited some support for the theory. *See id.* at 219–21 (distinguishing *Green* on the basis of the existence of a state law injunction remedy). The difficulties inherent in this reference to state remedies to determine the materiality element of the federal claim have only begun to be examined. *See id.* at 221, 222–24 (Meskill, J., dissenting); *Goldberger v. Baker,* 442 F.Supp. 659, 665–66 n.6 (S.D.N.Y.1977).[4] Nevertheless, the plaintiffs here argue that either they could have resisted the exercise of the option, or that they could have gained some affirmative relief from a state court, presumably in the form of an injunction or a declaratory judgment holding the option unenforceable.

The instant case, of course, is not a derivative action on behalf of a public corporation challenging a merger or other transaction adversely affecting minority shareholders. *See, e. g., Goldberg v. Meridor, supra; Drachman v. Harvey,* 453 F.2d 722, 736 (2d Cir. 1972) (en banc). But even assuming arguendo that the reference to state law remedies is proper in this context to determine questions of materiality and reliance, it is clear that the plaintiffs cannot prevail.

The parties agree that the validity and enforceability of the option restriction on Kerrigan's shares is governed by the law of Delaware, the state of incorporation.[5] The restriction, in the form of a repurchase option arising upon the death of the shareholder, was contained in the Merrill Lynch certificate of incorporation and the restricted nature of the stock was conspicuously noted on the face of the shares. Section 202(c)(1) of the Delaware Corporation Law, Del.Code tit. 8, § 202(c)(1) (1975), permits a restriction on the transfer of securities if it

> "obligates the holder of the restricted securities to offer to the corporation . .

---

4. Indeed, the necessity for requiring a showing of actual causation through the existence of a state law remedy, in a context in which a duty to disclose has other benefits consistent with the 1934 Act, is unclear. *Cf. Schlick v. Penn-Dixie Cement Corp.,* 507 F.2d 374 (2d Cir. 1974), *cert. denied,* 421 U.S. 976, 95 S.Ct. 1976, 44 L.Ed.2d 467 (1975).

5. Plaintiffs do not assert that they could have resisted the exercise of the option under the law of any other state, although the conflict of laws issues which might be raised by such an assertion could be troublesome. *See, e. g., Goldberg v. Meridor,* 567 F.2d at 224 n.9 (Meskill, J., dissenting).

a prior opportunity . . . to acquire the restricted securities."

Section 202(a) provides that such a restriction, if noted on the shares, is enforceable against the "holder . . . or any successor . . . including an executor, administrator, . . . or other fiduciary entrusted with like responsibility for the person or estate of the holder."

As Professor Folk, the reporter for the Delaware revision commission that prepared the statute, has stated:

"A restriction is valid if it requires the holder of restricted securities to tender them to designated persons who must act within a reasonable period of time thereafter. Such a restriction could take the form of a mere first refusal or of an option to acquire the securities."

E. L. Folk, *The Delaware General Corporation Law* 198 (1972). *See DeVries v. Westgren,* 446 Pa. 205, 287 A.2d 437 (1971) (affirming lower court's construction of similar Pennsylvania statute). *See generally Comment,* 9 B.C.Ind. & Com.L.Rev. 405 (1968). The Delaware statute on its face permits the type of option contained in the Merrill Lynch certificate.

■ The plaintiffs, nevertheless, argue that the exercise of the option was not justified by a "valid business purpose" and was therefore improper.[6] Plaintiffs have cited no Delaware authority for this proposition, and the legislative history of section 202(c)(1) specifically repudiates the idea that such a restriction on transfer must be justified by a business purpose to be enforceable. Before the adoption of section 202(c)(1), the Delaware courts required that

such a restriction be supported by a specific justification, and it was unclear what reasons for such restrictions would be sufficient "business purposes." *See* E. L. Folk, *The Delaware General Corporation Law* 198 (1972). One purpose of section 202(c) was to eliminate the uncertainty by validating such options by removing the need for a specific showing of business purpose. *Id.* at 198–99. Accordingly, the Merrill Lynch option was valid on its face and did not need such a specific justification to be enforceable.

This reasoning has led the Eighth Circuit to uphold the enforceability of the identical Merrill Lynch repurchase option in a strikingly similar case. In *St. Louis Union Trust Co. v. Merrill Lynch, Pierce, Fenner & Smith, Inc.,* 562 F.2d 1040 (8th Cir. 1977), *cert. denied,* 429 U.S. 1010, 97 S.Ct. 542, 50 L.Ed.2d 619 (1978), the court reversed a district court that found the option had been exercised unfairly and without justification and was therefore unenforceable. The Eighth Circuit held the section 202(c)(1) validated the option and did not require a "business purpose" justification. In so holding, the court determined "as a matter of law" that the plaintiff could not show the necessary materiality for a 10b–5 claim. *Id.* at 1049. *St. Louis Union Trust,* as a result, is directly on point in this case.

■ In a last ditch effort to show materiality here, plaintiffs cite Delaware cases standing for the general proposition that technically legal use of corporate machinery cannot be justified if accompanied by an improper motive to injure minority shareholders.[7] None of these cases questions the

---

**6.** Plaintiffs argue that the original purpose of the option was to meet the provisions of New York Stock Exchange Rule 313.21, which required the company to repurchase stock of a deceased shareholder so long as the stock was not freely transferable. As previously mentioned, the exchange amended the Rule on March 26, 1970, to permit member firms to issue freely transferable securities; thus, plaintiffs say that after that date no purpose existed to justify the option.

Plaintiffs have overlooked the fact that Rule 313.21 continued to apply to Merrill Lynch until the corporation had freely transferable

shares outstanding, which it did not at the time of the exercise of the option in this case. Indeed, even if a "business purpose" justification was needed under Delaware law, it seems clear that many existed. *See St. Louis Union Trust Co. v. Merrill Lynch, Pierce, Fenner & Smith, Inc.,* 562 F.2d 1040, 1046 n.9, 1053 n.17 (8th Cir. 1977), *cert. denied,* 429 U.S. 1010, 97 S.Ct. 542, 50 L.Ed.2d 619 (1978).

**7.** *See, e. g., Singer v. Magnavox Co.,* 380 A.2d 969 (Del.1977); *Kemp v. Angel,* 381 A.2d 241 (Del.Ch.1977); *Petty v. Penntech Papers, Inc.,* 347 A.2d 140 (Del.Ch.1975); *Condec Corp. v.*

enforceability of the type of option restriction at issue here, and none holds that a "business purpose" or "fairness" requirement will be superimposed on section 202(c)(1). Under Delaware law, Merrill Lynch had a right to exercise the valid option to repurchase Kerrigan's shares from his estate. For this reason, whatever deficiencies, if any, there were in disclosure did not and could not have affected plaintiffs, for they had the legal obligation to sell the shares at the predetermined price. Because the plaintiffs cannot show that any of the alleged nondisclosures were material in this sense, the complaint cannot support a claim for relief under Rule 10b–5.

The cases in this circuit support this result. In *Ryan v. J. Walter Thompson Co.*, 453 F.2d 444 (2d Cir. 1971), *cert. denied*, 406 U.S. 907, 92 S.Ct. 1611 (1972), the defendant corporation exercised a similar stock restriction that enabled it to repurchase shares from officers whose employment with the corporation ended. Like this case, the plaintiff there complained that the company had not disclosed a plan for a public offering when it repurchased his shares upon his retirement. After stating that the plaintiff's theory was "wholly inappropriate and wide of the Congressional mark," *id.* at 445, the Second Circuit held that "since Ryan was obligated to sell his shares to JWT . . . whatever he knew or did not know regarding JWT's plans to go public was irrelevant." The holding comported with previous cases in this and other circuits. *See e. g., Fershtman v. Schechtman*, 450 F.2d 1357 (2d Cir. 1971), *cert. denied*, 405 U.S. 1066, 92 S.Ct. 1500, 31 L.Ed.2d 796 (1972); *Blackett v. Clinton E. Frank, Inc.*, 379 F.Supp. 941 (N.D.Ill.1974). *See also Keating v. BBDO International, Inc.*, 438

F.Supp. 676 (S.D.N.Y.1977). *Cf. Ketchum v. Green*, 557 F.2d 1022 (3d Cir.), *cert. denied*, 434 U.S. 940, 98 S.Ct. 431, 54 L.Ed.2d 300 (1977).[8]

■ In the end, the plaintiffs' materiality theory is, in effect, that had they known of the plan for a public offering, they would have resisted the repurchase of Kerrigan's shares by asking the state court to make new law holding the exercise of the option in that context to be "unfair" or discriminatory under state fiduciary standards. This avenue, however, existed for plaintiffs in 1971, when they first learned of the offering, since they could always sue in state court requesting damages for the alleged violation of state corporation law. Moreover, the simple ability to bring a suit attempting to establish new law in Delaware cannot be sufficient to establish materiality under Rule 10b–5, for under that logic, every seller, no matter how clear his legal obligation to sell under state law, could later challenge the disclosure surrounding the transaction in federal court. Rule 10b–5 was not designed to serve as a federal vehicle for raising pure state law questions. If this were permitted, federal courts would be required to speculate on new questions of state corporation law in order to determine only *one* element of the federal 10b–5 claim. Clearly, if a state claim existed for the plaintiffs in this case, they had the opportunity to assert it in state court, and the federal interest in such a novel question of state law is at best slight.

■ Similarly, the allegations by Mrs. Kerrigan that the defendants failed to inform her of a company policy allowing some

---

*Lunkenheimer Co.*, 43 Del.Ch. 353, 230 A.2d 769 (1967).

**8.** This case does not require a holding that a plaintiff whose shares are repurchased pursuant to an option triggered by a voluntary act like retirement cannot show the necessary materiality. *But see, e. g., Ayers v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 538 F.2d 532 (3d Cir.), *cert. denied*, 429 U.S. 1010, 97 S.Ct. 542,

50 L.Ed.2d 619 (1976). In the instant case, it was Kerrigan's death that gave rise to the corporation's right to repurchase and the estate's obligation to sell. Further, in order to meet the requirements of New York Stock Exchange Rule 313.21, Merrill Lynch was forced to buy back the stock, since in December of 1970 it had not yet issued freely transferable shares. *See* note 6 *supra.*

widows to retain or repurchase some of their husbands' stock and that the policy was executed in a discriminatory way or in violation of state fiduciary duties do not aid the attempt to state a federal claim. It is clear that she was not a purchaser or seller and therefore has no standing to assert a claim under Rule 10b–5. *Blue Chip Stamps v. Manor Drug Stores,* 421 U.S. 723, 95 S.Ct. 1917, 44 L.Ed.2d 539 (1975); *Birnbaum v. Newport Steel Corp.,* 193 F.2d 461 (2d Cir.), *cert. denied,* 343 U.S. 956, 72 S.Ct. 1051, 96 L.Ed. 1356 (1952). To the extent that this claim alleges solely a violation of state law fiduciary principles, it is even more clearly outside the scope of the Rule. Like the rest of the complaint, this claim is essentially a claim for relief based on state law, and an interpretation of the Rule which allowed it to proceed in federal court would be inconsistent with the purpose and scope of federal securities laws. *See Santa Fe Industries, Inc. v. Green,* 430 U.S. at 479, 97 S.Ct. 1292, *quoting Cort v. Ash,* 422 U.S. 66, 84, 95 S.Ct. 2080, 45 L.Ed.2d 26 (1975).[9]

### III.

■ The remainder of the plaintiffs' amended complaint does not add anything capable of withstanding defendants' motion. Plaintiffs have added a claim based on section 9 of the 1934 Act, 15 U.S.C. § 78i, alleging that stock purchases by the named defendants during the "twilight" period before the offering constituted "manipulation" in violation of that section. Beside the fact that section 9 does not itself apply to privately held securities, *Dorfman v. First Boston Corp.,* 336 F.Supp. 1089 (E.D. Pa.1972), it is also clear that these plaintiffs suffered no damage as a result of any alleged manipulation of the price of the stock.

The remedy under section 9 is limited to persons who purchase or sell at "a price which was affected by" the defendants' improper conduct. 15 U.S.C. § 78i(e). Plaintiffs, however, sold pursuant to the repurchase option at a predetermined net book value price which could not have been affected by any of the manipulation or insider trading alleged in the complaint. Simply stated, broad allegations of "fraud" and "insider trading" do not state a private individual claim without some allegation that the plaintiffs were injured as the result of the misdeeds.

■ Because the Court has determined, with the aid of some materials outside of the pleadings,[10] that the complaint cannot support a claim for relief under federal law, the remaining pendent claims of the complaint charging violations of state law are dismissed under *United Mine Workers v. Gibbs,* 383 U.S. 715, 726, 86 S.Ct. 1130, 16 L.Ed.2d 218 (1966). *See Iroquois Industries, Inc. v. Syracuse China Corp.,* 417 F.2d 963, 970–71 (2d Cir. 1969), *cert. denied,* 399 U.S. 909, 90 S.Ct. 2199, 26 L.Ed.2d 561 (1970).

For the foregoing reasons, the defendants' motion for summary judgment is granted, and the complaint is dismissed.

SO ORDERED.

9. Plaintiffs, no doubt realizing that their complaint is primarily one raising state law issues, have apparently filed a parallel action in New York Supreme Court.

10. These include the Merrill Lynch certificate of incorporation quoted in note 2 *supra,* the letter from the company notifying plaintiffs of the exercise of the option in December, 1970, the share certificates for Mr. Kerrigan's stock (with the restriction conspicuously noted), and the agreement entered into by Kerrigan and the company upon his retirement in 1964. There is no factual dispute among the parties as to the existence or accuracy of these documents.