**STANDARD METALS CORPORATION, Plaintiff,**

v.

**S. Stokes TOMLIN, Jr., Edward L. Gaylord, Gayno, Inc., Homer E. Noble, Noble Mining Company, and the Oklahoma Publishing Company, Defendants.**

**No. 80 Civ. 2983.**

United States District Court, S. D. New York.

Aug. 14, 1980.

Windels, Marx, Davies & Ives by Paul Windels, Jr., Charles L. Stewart, Andrew N. Grass, Jr., Anthony A. Dean, Paul J. Dillon, New York City, for plaintiff.

Reavis & McGrath by Nathaniel L. Gerber, New York City, and McClain, Mellen, Bowling & Hickman by Michael T. Turner, Atlanta, Ga., for defendant Tomlin.

Gordon, Hurwitz, Butowsky, Baker, Weitzen & Shalov by Theodore Altman, Franklin B. Velie, Paul D. Wexler, New York City, and Pierson, Ball & Dowd by William O. Bittman, Frederic J. Spindel, Washington, D. C., for defendants Edward L. Gaylord, Gayno, Inc., Homer E. Noble, Noble Mining Co., and The Oklahoma Pub. Co.

MOTLEY, District Judge.

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

*Findings of Fact*

Plaintiff, Standard Metals Corp. ("Standard"), has moved for an order granting a preliminary injunction against defendants in this action. Plaintiff alleges that defendants have violated Section 13(d) of the Securities Exchange Act of 1934, 15 U.S.C. § 78m(d), and Section 10(b), 15 U.S.C. § 78j(b), as well as Rule 10b–5, promulgated thereunder, 17 C.F.R. § 240.10b–5.

Plaintiff seeks an order preliminarily enjoining defendants: 1) from further violations of Sections 10(b) and 13(d), and Rule 10b–5; 2) from voting their shares and soliciting proxies at the forthcoming 1980 shareholders' meeting; 3) from purchasing and seeking to purchase additional shares of plaintiff's common stock; 4) from acquiring any further control over plaintiff; and 5) from selling and otherwise disposing of the 23,100 shares of restricted stock acquired from plaintiff by defendant Tomlin.

The jurisdiction of this court is premised upon Section 27 of the Securities Exchange Act of 1934, 15 U.S.C. § 78aa. After a hearing on this motion for a preliminary injunction, the court makes the following findings of fact and conclusions of law.

*Parties*

Defendant Oklahoma Publishing Co. ("Oklahoma Publishing") is a privately held Delaware corporation with its principal place of business in Oklahoma City, Oklahoma. (Complaint ¶ 10). Oklahoma Publishing's president and principal shareholder is defendant Edward Gaylord. (G. at 8; G. Exh. 32).[1] Oklahoma Publishing's principal sources of income are its radio and television broadcasting stations and its newspaper publications. (G. at 8–9). Oklahoma Publishing also has substantial deposits with Oklahoma Bank and has outstanding loans of $16,400,000. (G. 316–17; Pl. Exh. 11 n.6).

Plaintiff is a publicly held Delaware corporation with its principal place of business

---

1. The following abbreviations will be used in this opinion:

Transcript of the preliminary injunction hearing, June 19–25, 1980 (Tr. _____)

Deposition and exhibits of Edward L. Gaylord (G. _____ and G. Exh. _____)

Deposition and exhibits of Homer E. Noble (N. _____ and N. Exh. _____)

Deposition of Oklahoma Publishing, by Glenn Stinchcomb (Stinchcomb _____)

Deposition and exhibits of S. Stokes Tomlin, Jr. (T. _____ and T. Exh. _____)

Affidavit of Boris Gresov (Gr. _____)

in New York City. (Gr. Aff. ¶¶ 4, 7). Plaintiff has approximately 2,391,150 shares outstanding, as of December 31, 1979, which are held by approximately 6,000 shareholders. (Pl. Exh. 5 at 1, 8). Since 1964, Boris Gresov has been plaintiff's chief executive officer. (Gr. Aff. ¶ 1; Tr. 29). Plaintiff's primary line of business has been, and continues to be, mining ventures involving various metal ores. (Pl. Exh. 5 at 2). Plaintiff's most important mining property in recent years has been the Sunnyside Mine in Silverton, Colorado, (Gr. Aff. ¶ 4), which produces marketable ore of gold, lead, silver, zinc, and copper. (Tr. 61).

Defendant Homer E. Noble is a Colorado resident and a promoter and operator of mining ventures. Noble has been acquainted with defendant Gaylord for a number of years, and both of them have been involved in various business ventures together, including co–ownership of defendant Gayno, Inc. (G. at 49–60; G. Exh. 32 Item 5; N. 3–7, 9–10, 21–28, 37, 59, 61–67).

Defendant Gayno, Inc. ("Gayno"), is a Colorado corporation engaged in natural resources development. Gayno was formed by Gaylord and Noble to take over the operation of their previously existing business ventures. (N. 21, 25; G. 74–76). Gayno is principally financed through loans from the First National Bank & Trust Co. ("Oklahoma Bank"), a subsidiary of Oklahoma Bancorporation Inc. (N. Exh. C30 at 8). Noble is Gayno's chief operating officer and owns thirty percent of Gayno. Gaylord owns the remaining seventy percent of Gayno. (N. at 25; G. at 10–11).

Defendant Noble Mining Co. ("Noble Mining") is a family holding company owned by Noble and his family. (G. Exh. 32 Item 5; N. Exh. C at 44).

Defendant S. Stokes Tomlin is a sixty-six–year–old former consulting engineer of plaintiff. Tomlin had been previously employed at plaintiff in various capacities since 1964.

*Parties' Contentions*

The gravamen of plaintiff's claim under Section 13(d) against defendants Oklahoma Publishing, Gaylord, Noble, Noble Mining, and Gayno [hereinafter referred to as the "Gaylord defendants," for purposes of convenience], is that prior to the filing of a Schedule 13D on May 8, 1980, the Gaylord defendants had secretly formed a group whose purpose was to take over and acquire control of plaintiff through stock purchases and other aggressive conduct. In particular, plaintiff asserts that the Gaylord defendants conspired as a group to use plaintiff as a conduit to convert their own privately held mining properties, specifically Cimarron Coal and various other oil and gas properties, into plaintiff's stock. Plaintiff also alleges that the Gaylord defendants systematically gathered confidential information concerning plaintiff by "subverting" insiders. In addition, plaintiff alleges that this "secret conspiracy" entails plans to elect candidates to plaintiff's board of directors, proxy solicitation, and a tender offer. (Complaint ¶¶ 31(c), 32(a)–(e)). With respect to the May 8, 1980, Schedule 13D, plaintiff claims that the Gaylord defendants failed to disclose their plan to seize control of plaintiff, the source of funds used to purchase their stock, and the proper identities of the purchasers.

Plaintiff also contends that the Gaylord defendants and defendant Tomlin violated Section 10(b) and Rule 10b–5. Specifically, plaintiff contends that the Gaylord defendants' secret conspiracy to seize control of plaintiff amounts to fraud and deception on the public, the issuer, and plaintiff's stockholders. With respect to defendant Tomlin, plaintiff alleges that Tomlin conveyed his lettered stock to Gaylord and Gayno in a deceptive transaction which should also be considered part of the overall scheme to seize control of plaintiff. Plaintiff claims that Tomlin misrepresented to plaintiff his intent to hold the shares for investment, when in fact he had already entered into a secret agreement to resell the shares he was to acquire by exercising his option. Finally, plaintiff alleges that the Gaylord defendants committed fraud on the open market by failing to disclose the formation of a group to acquire control of plaintiff, as well as by failing to disclose their trading of

plaintiff's stock on the basis of inside information.

Defendants deny each and every one of plaintiff's allegations. The Gaylord defendants contend that all of their filings under Section 13(d) were accurate and complete in all respects. The Gaylord defendants deny that any group was formed prior to the time disclosed in the May 8, 1980, Schedule 13D. Moreover, they deny that they at any time, either individually or as a group, intended to seize control of plaintiff or to foist property on plaintiff. The Gaylord defendants contend that all sources of funds used to purchase their stock were fully disclosed in the Schedule 13D. Defendant Tomlin contends that his exercise of his option and the resale of his shares was entirely proper.

*Investment Activities of the Gaylord Defendants*

The record reveals that defendants Gaylord and Noble have had many business dealings with each other since the 1950's, primarily dealings concerning ore and mining ventures. Noble, as an individual investor, became interested in Standard as an attractive investment opportunity in the late 1970's. Standard, for the most part, presented an attractive investment prospect for investors in equity securities in the mining and natural resources field. Standard, at the present time, has only recently overcome some financial difficulties. In the late 1960's, Standard experienced severe cash flow problems, and in 1971 Standard sought relief in a Chapter XI proceeding. (Tr. at 59–60). By the fall of 1973, this proceeding was successfully concluded. Standard's financial position was also improved by the success of its Sunnyside Mine operation, which produced gold, lead, and zinc ores in marketable quantities. This rosy financial picture was tarnished, however, by the flooding of this mine in the late 1970's.

In the mid–1960's, Noble had one contact with plaintiff through its chief operating officer, Gresov. This contact concerned a possible exchange of Noble's mining properties for plaintiff's stock. These negotiations came to naught, for Gresov consulted geologists who recommended against the acquisition of Noble's properties as worthless "moose pasture." (Tr. at 54–55, 59, 173–74). Noble had no other contact with Gresov until he resumed his investment in plaintiff in the late 1970's.

In view of the success of the Sunnyside mining operation, Noble began to purchase plaintiff's shares in late December, 1977, and early January, 1978, acquiring approximately 20,000 shares at an average price of $7 per share. (Pl. Exh. 7; N. at 126; N. Exh. A at 62–63). Subsequently, Noble sold 5,300 of these shares in September, 1978, at a price of $12 per share, thus realizing a profit on his investment. (N. Exh. A at 62). Noble's purchase pattern thus suggests an attempt to maximize profits, selling shares when the price rose and buying when the price fell. *Id.*

In November or December, 1979, Noble obtained a geological report prepared by a third–party for the First Mississippi Corp., a company unrelated to any of the parties in this action. (N. at 182). The report contained detailed information about plaintiff's ore–producing property. (Tr. at 103–04). While the report had not been widely disseminated to the public, the sole testimony suggesting that the information was confidential was by Gresov. In any event, the report confirmed the belief of Gaylord and Noble that there were ores of gold in the Silverton/Sunnyside Mines and that the royalties were high. (N. at 185–86).

Apparently as part of his on–going investments, Noble also consulted between 1976 and 1978 with Richard Dwelley, a vice–president for mining operations of plaintiff. (Tr. at 5, 369). Dwelley suggested that Gresov's shares might be for sale. During the course of a conversation, Noble asked Dwelley if Gresov planned to stay on as president should Gresov sell his shares. (N. at 272). It is reasonable to infer that Noble was concerned that plaintiff would retain experienced management should Noble acquire Gresov's stock.

In 1977, Noble did meet again with Gresov, this time to discuss a possible exchange

of Noble's Cimarron coal property for plaintiff's stock. Cimarron had been formed in early 1977 by an agreement among Noble Mining, Gaylord, Waldeck, and AU Mines. (N. Exh. 26). The total cash investment in the Cimarron partnership was $10,000. (G. at 314; N. Exh. C26 at 4). The Oklahoma Bank had loaned Cimarron approximately $7,100,000 (N. Exh. C33 n.4), which was used to purchase coal properties in New Mexico.

On August 20, 1979, Gresov expressed an interest in having plaintiff acquire the Cimarron properties, but Gresov also informed Noble that his own shares were not for sale. (N. at 281; Tr. at 65, 71; Gr. Aff. ¶ 21). Noble, however, did not follow through on Gresov's expression of interest, and nothing came of the deal. (Tr. at 65, 67). Several months elapsed after this meeting, and Gresov still had heard nothing from Noble concerning Gresov's proposal to acquire Cimarron. This aborted venture alone would seem to belie plaintiff's allegation that the Gaylord defendants are intent on foisting the Cimarron properties onto plaintiff.

With respect to the other Gaylord defendants, the record fails to reveal an orchestrated or synchronized effort to accumulate plaintiff's stock in 1977 and 1978, despite the close business and personal relationship between Noble and Gaylord. At the time of Noble's initial purchases of plaintiff's stock in 1977 and 1978, Gaylord sold all but 500 of his shares. Commencing in 1963, Gaylord had made several occasional investments, and on September 27, 1977, Gaylord had acquired 10,000 shares of plaintiff and received a stock dividend of 500 shares. (G. at 46–47, 63). In December, 1977, Gaylord sold all but 500 of his shares for tax reasons, suffering a substantial loss in profits. (G. at 64). As a shareholder, Gaylord did not take any active part in plaintiff; in fact, he neither voted his shares nor attended the annual meeting in 1979. (N. at 289).

With respect to Noble Mining's holding, Noble Mining bought 15,000 shares of plaintiff in December, 1979. (N. Exh. A at 53). Thus, the combined Noble and Noble Mining holdings of plaintiff's stock are approximately 37,000 shares. (G. Exh. 32).

Oklahoma Publishing's investment in plaintiff's stock commenced in 1978. Oklahoma Publishing gradually accumulated 469,300 shares of plaintiff over the next twenty–seven months. (G. Exh. 6). These shares represented approximately nineteen percent of all of plaintiff's outstanding stock. Oklahoma Publishing has filed the required Schedule 13D's since the time its holdings exceeded five percent of the total issued common stock of plaintiff. (G. Exhs. 8, 9, 17, 18, 19, 20, 21, 32).

The record discloses that Oklahoma Publishing's purchases were made from its working capital, not from any surreptitious borrowing or extraordinary sales of assets as suggested by plaintiff. Oklahoma Publishing's financial statements clearly indicate that the company was not suffering any shortage of working capital and had sufficient funds to make substantial purchases of stock. For example, during the period of purchases of plaintiff's stock, Oklahoma Publishing had an increase in working capital of more than $16 million. (Pl. Exh. 11). Moreover, Glenn Stinchcomb, treasurer and assistant secretary of Oklahoma Publishing, directly testified that no borrowed funds were used to purchase shares of plaintiff. (Stinchcomb at 64). The company's financial statements demonstrate that, contrary to plaintiff's argument, Oklahoma Publishing had a pre–existing bank debt which was not a debt incurred to purchase plaintiff's shares. (Pl. Exhs. 10, 11). No evidence, aside from plaintiff's speculation, exists to support a finding that Gaylord, in his capacity as an official of the Oklahoma Bank, facilitated loans to Oklahoma Publishing for the purchase of plaintiff's stock.

As disclosed in several Schedule 13D's, Gayno also made purchases from its working capital. Defendants Gaylord and Noble made their purchases from personal funds and a loan from Gayno, as disclosed in the Schedule 13D. (N. at 28–31, 143–45; N. Exh. A at 72–104; G. Exh. 32 Item 3; N. at 223–24; G. at 137–39). It should be noted

that Gayno was indebted to Oklahoma Bank for more than $6,275,000, of which $2,390,-000 was unsecured. While it may have been imprudent banking practice to have loaned this money to Gayno, no credible evidence has been adduced that Gaylord used his influence to facilitate Noble's purchase of stock. (N. Exh. C32 at 9).

On May 8, 1980, Oklahoma Publishing filed a Schedule 13D which disclosed, among other items, that Noble, Gaylord, and Oklahoma Publishing had formed an investment "group." In particular, the Schedule 13D discloses that:

1) the persons filing the Schedule 13D had no purpose or intent of influencing control over plaintiff at the time of previous purchases;

2) on April 30, 1980, the Gaylord defendants agreed to act together as a group to exert influence on the policies and management of plaintiff; "although no plan presently exists to acquire control of [plaintiff], the group's collective intention to influence the issuer's policies and management may be deemed to constitute an intention to exercise "control";

3) members of the group intend to cast their votes in a single block and also will communicate with other shareholders regarding equity interests;

4) the group has not reached a decision as to whether to seek representation on the Board of Directors, or to engage in any proxy solicitation;

5) the group will discuss possible sources of action for the group, involving stock purchases or tender offers, but the group has no present plans to liquidate, sell the assets of, or merge with plaintiff, or to make any material change in the nature of the business or corporate structure of plaintiff.

*The Tomlin Transaction*

Defendant Tomlin's investment in plaintiff has been considerably more limited than that of the Gaylord defendants. At no time, for example, has Tomlin become subject to the disclosure requirement of Section 13(d) since he has never accumulated more than five percent of the stock of plaintiff. Tomlin's holdings prior to March, 1980, consisted entirely of an option to purchase approximately 23,000 shares of unregistered, restricted shares.

Beginning in 1965, plaintiff granted stock options to Tomlin, an employee at the time, in lieu of salary increases. (T. Exh. 1). In early 1974, Tomlin acquired the option at issue. On January 21, 1974, the board of directors of plaintiff resolved, in pertinent part:

RESOLVED: that the corporation does hereby grant to Samuel S. Tomlin, Jr. an unqualified stock option for 20,000 shares of its common stock at the average price of the shares on the American Stock Exchange today, to wit, $4.375 per share, exercisable as follows: 10,000 shares after January 1, 1975 and 10,000 shares after January 1, 1976, but not later than January 1, 1979; provided that prior to the issuance of the option shares Mr. Tomlin shall sign an investment letter stating that the shares are being acquired by him solely for investment and not with any intention of making a public sale or distribution thereof.

(T. Exh. 4).

At the time of exercise, due to various anti–dilutive provisions, the option was for 23,100 shares of common stock at $3.79 per share. Between 1974 and 1980 Tomlin requested and received three extensions on the exercise of his option, the last of which expired on April 30, 1980. (T. Exhs. 8, 33).

The 1974 option constituted an unconditional and absolute obligation by plaintiff to sell the stock to Tomlin upon his exercise of the option, qualified only by the proviso that Tomlin shall sign an investment letter. (T. Exh. 4). Aaron Holman, secretary and treasurer of plaintiff, later clarified this restriction in response to Tomlin's inquiries. The substance of Holman's advice was that the shares could not be sold "except in accordance with the rules laid down by the SEC." (T. Exh. 85).

Soon after Tomlin acquired this option, he realized that he might have difficulty in

financing the exercise of the option due to insufficient resources. In 1978, Tomlin contacted Holman and asked him to investigate various courses of action which might alleviate the potential funding problems. Tomlin stated in a letter to Holman (T. Exh. 86):

> If I sell the shares, acquired by option, to a private person who also signs an 'investment letter' will such a sale be permitted under the rules of the Securities and Exchange Commission?
>
> I will have to borrow funds to acquire the shares covered by this option and if the market takes a bad drop I would need a way out. A private sale might provide that out.

In Holman's reply letter to Tomlin (T. Exh. 87), Holman stated:

> I have your letter of May 12. Your question about selling your shares to another party who gives you an investment letter may be answered in the affirmative. In other words, so long as the purchaser agrees not to make a public sale or distribution of the stock and is bound by the similar investment letter, the sale would be valid. The buyer, however, would have to be prepared to exhibit the letter to Standard in order for us to authorize the transfer agent to issue a new certificate to him with the same kind of restrictions stamped on it as your certificate will have.

Holman also provided Tomlin with a form of an investment letter which would be required in the event that Tomlin decided to sell the shares after the exercise of the option. This form letter stated, in pertinent part, that: 1) the shares were being acquired for investment and not with any intention to make a public sale or distribution thereof in contravention of the Securities Act of 1933, as amended, or the Rules and Regulations issued in connection therewith; and 2) the shares may not be sold or distributed except in accordance with the provisions of the said Act and the aforesaid Rules and Regulations. (T. Exh. 85).

This form letter, substantially identical to the investment letter eventually signed by Tomlin, contains two important representations: 1) that the shares were to be acquired for investment—that is, to be held for the account of the purchaser for an unspecified time; and 2) that the shares were not to be sold in a public sale or distribution in contravention of the Securities Act of 1933. Subsequent correspondence confirmed that Tomlin could conduct his own private placement, without regard to the two–year holding period of Rule 144. (T. Exh. 88).

By late 1979, the price of Standard stock greatly exceeded the exercise price on Tomlin's option contract. (Pl. Exh. 7; T. Exh. 33). Tomlin then became alarmed at the adverse tax consequences which would accompany his exercise of the option—an immediate recognition of ordinary income equal to the difference between the exercise price and the market price at time of exercise. Tomlin informed Gresov of his difficulty in financing the investment. (T. Exhs. 13, 4).

In January and February of 1980, Tomlin attempted to have the option revised so as to defer any payment of taxes pending the expiration of a two–year period pursuant to Rule 144. This plan was rejected by plaintiff. (T. at 114–16). With this avenue foreclosed, Tomlin began to pursue the possibility of a private sale of his shares. At the same time, Tomlin informed plaintiff that he possibly would borrow funds to exercise his option. (T. Exhs. 11, 12).

On February 29, 1980, Tomlin contacted Grant King, a wealthy friend of Tomlin's with substantial experience in oil and natural resource development. (T. Aff. ¶ 22). King declined Tomlin's offer of sale of these shares because King's previous investments precluded such a purchase. (T. Aff. ¶ 22). On March 6, 1980, Tomlin contacted Noble and Gaylord to inquire about their possible purchase of his option shares. (T. Aff. ¶ 23). Tomlin had had previous acquaintance with Noble in the 1950's through Waldeck and had consulted with Noble in connection with a proposed mining venture in Arizona. (N. Exh. E). Tomlin also knew Noble and Gaylord to be substantial investors in natural resources develop-

ment and that Oklahoma Publishing had previously made a multi–million dollar investment in plaintiff's shares. (T. at 357–58).

Noble and Gaylord were amenable to purchasing Tomlin's shares, provided that all agreed on a price reflecting the appropriate discount of the restricted shares from the market price. (N. at 315–16; G. at 204; T. at 119). Plaintiff's witness testified at the preliminary injunction hearing that unregistered stock would usually sell at a discount from twenty percent to fifty percent from the market price. (Tr. at 205). He suggested that unregistered stock of plaintiff would sell at a discount of thirty to forty percent from the market price. (Tr. at 214–19).

After negotiations which were somewhat difficult due to the complexity of the formula Tomlin sought to use for the price, Tomlin and Noble entered into an agreement for a purchase of the shares by Gayno. (T. at 138; N. at 332–33). Tomlin then returned to Atlanta, where he discovered an error in the pricing formula. (N. at 350-51). On March 11, 1980, Gaylord obtained Oklahoma Publishing's approval allowing Gaylord to acquire shares personally. (G. at 269–70; G. Exh. 25). On March 12, 1980, Tomlin returned to Noble's office in Denver to renegotiate the terms of the price at a formula calculated to give Tomlin $3.00 per share above his exercise price and income tax liability, for a total of $69,300. (T. Exh. 29).

An agreement was drafted for Tomlin to sell his shares to Gayno and Gaylord. (T. at 138–39; T. Exh. 29). At Tomlin's insistence, the contract for resale provided that the purchasers would not make a public sale or distribution, that they would be bound by an investment letter similar to that which bound Tomlin, and that they agreed to submit to plaintiff an investment letter incorporating the terms in the contract for resale. (T. Exh. 29). This agreement also contained a provision that the transaction would be kept secret for ninety days. (T. Exh. 29). The Gayno board of directors approved this agreement and also authoriz-

ed Gaylord's purchase of 12,000 of the 23,100 shares involved. At Tomlin's request, the agreement was revised and then signed on March 21, 1980. (N. at 352; T. Exh. 42).

In the meantime, on March 13, 1980, Gayno forwarded to Tomlin $87,549, the option exercise price. Tomlin then forwarded these funds to plaintiff's offices in New York. (T. at 158; T. Exhs. 32, 33, 35). Accompanying the money sent to plaintiff was an investment letter, dated March 13, 1980, which states: "[I] hereby represent that upon the exercise of the option as to any of said shares, I shall acquire the shares for my own account and shall hold the shares for investment and not with any intention to make a public sale or distribution thereof in contravention of the Securities Act of 1933, as amended, or the Rules and Regulations issued in connection therewith." (T. Exh. 33). Plaintiff then issued Tomlin the certificate for 23,100 shares bearing the following legend:

> The shares represented by this certificate have not been registered under the Securities Act of 1933, as amended. The shares have been acquired for investment, and may not be sold, offered for sale, or transferred in the absence of an effective Registration statement for the shares under the Securities Act of 1933, as amended, or an opinion of counsel to the Company that registration is not required under the said Act.

(Tr. at 212).

On March 14, 1980, the date Tomlin exercised his option, the closing price for unrestricted stock of plaintiff was $17.75 per share. Thus, the total agreed price of $14.61 per share represented a 17.7% discount from the market price.

Tomlin delivered the stock certificate to his bank in Atlanta. On April 4, 1980, Tomlin closed the resale of his option shares to Gayno and received from Gayno an investment substantially identical to the form which he had provided to plaintiff. (T. Exh. 47). Gayno assigned 12,000 of these shares to Gaylord. (G. at 255–56). The entire transaction was described in detail in the Schedule 13D of May 8, 1980. (G. Exh. 32 Item 5).

*Conclusions of Law*

Plaintiff has moved for an order, pursuant to Rule 65 of the Federal Rules of Civil Procedure, preliminarily enjoining defendants

(a) From taking any action in violation of the Federal Securities Laws including, without limitation, Sections 10(b) and 13(d) of the Securities Exchange Act of 1934, 15 U.S.C. §§ 78j(b) and 78m(d) and all Rules and Regulations promulgated thereunder;

(b) From acquiring or seeking to acquire any common stock ($.03 par value) of Standard;

(c) From voting any shares of Standard common stock heretofore acquired by defendants or any of them at Standard's 1980 annual meeting and thereafter until otherwise directed by this Court;

(d) From soliciting any proxy, consent, authorization or agreement to vote any Standard common stock held by persons other than defendants at Standard's 1980 annual meeting and thereafter until otherwise directed by this Court;

(e) From taking any further steps to obtain or exercise control of Standard by any means;

(f) From selling, transferring or granting to others any interest in 23,100 unregistered shares of Standard common stock acquired by defendants Gayno, Inc. and Edward L. Gaylord from S. Stokes Tomlin, Jr.;

(g) Granting Standard such other and further relief as may be just and proper.

The standard for a preliminary injunction in the Second Circuit is as follows:

> [T]here must be a showing of possible irreparable injury *and* either (1) probable success on the merits *or* (2) sufficiently serious questions going to the merits to make them a fair ground for litigation *and* a balance of hardships tipping decidedly toward the party requesting the preliminary relief. . . .

*Caulfield v. Board of Education of the City of New York,* 583 F.2d 605, 610 (2d Cir. 1978) [emphasis in original] *accord, KMW International v. Chase Manhattan Bank, N.*

A., 606 F.2d 10, 14 (2d Cir. 1979); *Jack Kahn Music Co. v. Baldwin Piano & Organ Co.,* 604 F.2d 755, 758–59 (2d Cir. 1979); *Seaboard World Airlines, Inc. v. Tiger International, Inc.,* 600 F.2d 355, 359–60 (2d Cir. 1979); *Buffalo Courier–Express, Inc. v. Buffalo Evening News, Inc.,* 601 F.2d 48, 54 (2d Cir. 1979); *Jackson Dairy, Inc. v. H. P. Hood & Sons, Inc.,* 596 F.2d 70, 72 (2d Cir. 1979).

■ Irreparable injury means injury for which a monetary award cannot be adequate compensation, and where money damages are adequate a preliminary injunction will not issue. *Jackson Dairy, Inc. v. H. P. Hood & Sons, Inc., supra,* 596 F.2d at 72; *accord Jack Kahn Music Co. v. Baldwin Piano & Organ Co., supra,* 604 F.2d at 759. A mere speculation that there is a possibility that the party seeking the injunction may in some unproved way suffer loss or damage is insufficient proof of a lack of remedy at law. *Jack Kahn Music Co. v. Baldwin Piano & Organ Co., supra,* 604 F.2d at 759. Absent any evidence, a district court cannot conclude that the plaintiff is likely to suffer irreparable injury. *See Caulfield v. Board of Education of the City of New York, supra,* 583 F.2d at 610.

*Plaintiff's Rule 10b–5 Claim Against Tomlin*

■ Plaintiff alleges that defendant Tomlin violated Rule 10b–5 when Tomlin forwarded to plaintiff a letter dated March 13, 1980, which stated, in pertinent part:

> I hereby represent that upon the exercise of the option as to any of said shares, I shall acquire the shares for my own account and shall hold the shares for investment and not with any intention to make a public sale or distribution thereof in contravention of the Securities Act of 1933, as amended, or the Rules and Regulations issued in connection therewith.

Plaintiff argues that two representations in the March 13, 1980, letter were false at the time they were made, and that Tomlin knew them to be false: 1) the representation that Tomlin shall acquire the shares for

his own account; and 2) the representation that Tomlin shall hold the shares for investment. Plaintiff argues that the representations were false because two days previously Tomlin had entered into a written agreement to sell the shares which he would acquire from plaintiff to Gaylord and Gayno.

Turning to the elements of a Rule 10b–5 violation, plaintiff argues that the materiality of the false representations is demonstrated by Tomlin's testimony that he feared that plaintiff's president would not permit the exercise of the option if he were aware of Tomlin's deal with Gaylord and Gayno. Plaintiff argues, moreover, that materiality is demonstrated by the fact that Tomlin's deal was contrary to plaintiff's purpose in granting the option to Tomlin—to give Tomlin a stake in plaintiff's future. Finally, plaintiff argues that it relied upon Tomlin's false statements in that plaintiff could not, knowing all the facts, have sold the shares to Tomlin because Tomlin's sale of the shares to Gaylord violated Section 5 of the Securities Act of 1933.

The court concludes that plaintiff has failed to show possible irreparable injury which would warrant a preliminary injunction against Tomlin. In fact, a close reading of plaintiff's proposed conclusions of law reveals that plaintiff has failed to allege any possible irreparable injury arising from the Tomlin transaction. As Tomlin has noted, the preliminary relief requested by plaintiff is obviously intended to be directed at the other defendants in this action, not Tomlin. Even assuming Tomlin violated Rule 10b–5 by making a false representation in the March 13, 1980, letter, plaintiff is not entitled to an injunction enjoining Tomlin from taking any action in violation of federal securities laws, since plaintiff has not shown an impending threat of future violations. Plaintiff's request for an injunction enjoining Tomlin from acquiring or voting common stock of plaintiff, from soliciting proxies from plaintiff's shareholders, and from taking any further steps to obtain control of plaintiff has no logical nexus to the alleged Rule 10b–5 violation by plaintiff. Finally, plain-

tiff's request for an injunction enjoining Tomlin from selling the option shares acquired by Gayno and Gaylord is moot, since Tomlin has already sold those shares and no longer has them in his control. In short, plaintiff has failed to show any possible injury arising out of the Tomlin transaction which would warrant the requested injunctive relief against Tomlin. Thus, plaintiff's motion for a preliminary injunction must be denied with respect to defendant Tomlin.

■ Plaintiff's motion for a preliminary injunction against Tomlin must also be denied for failure to show "either (1) probable success on the merits *or* (2) sufficiently serious questions going to the merits to make them a fair ground for litigation *and* a balance of hardships tipping decidedly toward the party requesting the preliminary relief." While there are serious questions going to the merits in this action, the court is of the view that plaintiff has failed to show a balance of hardships tipping decidedly in its favor. As discussed above, plaintiff has failed to suggest any possible irreparable injury arising out of the Tomlin transaction. Moreover, Tomlin would suffer severe hardships from the injunctive relief requested by plaintiff. It would seem that Tomlin, and not plaintiff, would be the party irreparably harmed by a preliminary injunction enjoining Tomlin from acquiring or voting common stock of plaintiff. In light of plaintiff's failure to show, or even explain, any possible irreparable injury arising out of the Tomlin transaction, and in light of plaintiff's failure to show any logical nexus between Tomlin's alleged Rule 10b–5 violation and the requested relief against Tomlin, it cannot be said that plaintiff has shown a balance of hardships tipping decidedly in its favor.

Of course, plaintiff may also satisfy the second prong of the preliminary injunction standard by showing probable success on the merits. The court concludes that plaintiff has failed to show probable success on the merits against Tomlin. In particular, plaintiff has failed to show probable success on the merits with respect to an essential

element of plaintiff's Rule 10b–5 claim against Tomlin.

■ Plaintiff has failed to show probable success on the merits with respect to the issue of causation and damages. It is well-established that a Rule 10b–5 violation must be predicated upon a finding of causal relationship between the alleged misrepresentation and losses or damages suffered by plaintiff. *E. g., Globus v. Law Research Services, Inc.,* 418 F.2d 1276, 1291–92 (2d Cir. 1969), *cert. denied,* 397 U.S. 913, 90 S.Ct. 913, 25 L.Ed.2d 93 (1970); *see List v. Fashion Park, Inc.,* 340 F.2d 457 (2d Cir.), *cert. denied,* 382 U.S. 811, 86 S.Ct. 23, 15 L.Ed.2d 60 (1965); *Kerrigan v. Merrill Lynch, Pierce, Fenner & Smith, Inc.,* 450 F.Supp. 639, 643 (S.D.N.Y.1978). In the case at hand, plaintiff has failed to show a probability of success on the issue of whether it suffered any injury or damage at all in the Tomlin transaction, let alone whether any injury or damage was causally related to Tomlin's allegedly false statements.

Plaintiff alleges that Tomlin's misrepresentation induced plaintiff into a violation of Section 5 of the Securities Act of 1933, 15 U.S.C. § 77e. Section 5 prohibits sales of a security unless a registration statement is in effect as to the security. Section 4(2) of the Securities Act of 1933, 15 U.S.C. § 77d(2), provides that Section 5 shall not apply to "transactions by an issuer not involving any public offering." Despite plaintiff's somewhat surprising argument to the contrary, the "private placement" exemption of Section 4(2) is unaffected by the additional means for selling restricted securities without registration provided by Rule 144. *See* 17 C.F.R. § 230.144(j).

Plaintiff argues, in effect, that Tomlin induced plaintiff to violate Section 5 by selling the shares to Tomlin, who, in turn, violated Section 5 by making offers to sell the unregistered shares in his "efforts to peddle the shares around Atlanta." As an initial matter, the court notes that plaintiff's assertion that Tomlin made "efforts to peddle the shares around Atlanta" is wholly unsupported by the record. In fact, Tomlin made appointments to speak with three personal acquaintances, but was able to keep only one of those appointments regarding the shares. More importantly, plaintiff is unlikely to succeed on the merits on the issue of whether Tomlin's resale to Gayno and Gaylord came within the clear exemption of Section 4(2).

The court concludes that Tomlin is likely to succeed in establishing that his sale of shares did not involve any public offering, and thus did not result in a Section 5 violation by either plaintiff or Tomlin. The Tomlin transaction appears to have been fully protected by Section 4(2). Of course, at trial Tomlin will have the burden of proving that his sale falls within the exemption of Section 4(2). *SEC v. Ralston Purina Co.,* 346 U.S. 119, 73 S.Ct. 981, 97 L.Ed. 1494 (1953). In determining whether a party has established that his sale falls within an exemption, the Supreme Court has explained:

> The design of the statute is to protect investors by promoting full disclosure of information thought necessary to informed investment decisions. The natural way to interpret the private offering exemption is in light of the statutory purpose. Since exempt transactions are those as to which "there is no practical need for [the bill's] application," the applicability of § 4(1) should turn on whether the particular class of persons affected need the protection of the Act. An offering to those who are shown to be able to fend for themselves is a transaction "not involving any public offering."

*Id.* at 124–25, 73 S.Ct. at 984 (footnote omitted).

The Supreme Court has explained that a Section 4 exemption is not available to an "underwriter." *Id.* at 122–23, 73 S.Ct. at 983–84. While an underwriter is defined as "any person who has purchased from an issuer with a view to ... the distribution of any security," 15 U.S.C. § 77b(11), since a "distribution" requires a "public offering," the ultimate question is whether there was a "public offering." *Gilligan, Will & Co. v. SEC,* 267 F.2d 461, 466 (2d Cir.), *cert. denied,* 361 U.S. 896, 80 S.Ct. 200, 4 L.Ed.2d

152 (1959). Accordingly, it has been noted that

> [a] person that purchases securities from an issuer with a view to investment, or with a view to reoffering them for investment to persons with whom the issuer might have sold them privately under the Section 4(2) exemption . . ., is not an "underwriter". Nor is one an "underwriter" when on the issuer's behalf he sells securities to such persons for investment . . . that is to say, that not all intermediaries between the issuers and investors are "underwriters", even though they may be professional broker-dealers.

4 L. Loss, Securities Regulation 25–80 (2d ed. 1961; Supp.1969).

In determining whether an offering is public or private, the Second Circuit has set forth the following guidelines:

> The focus of inquiry in such cases is not so much upon the nature of the offering as upon the need for protection of the class of offerees; i. e., whether they have the information which a registration would disclose, or have access to it. . . . The need for this protection remains the same whether sales are concentrated in a short period of time or made as part of a series of isolated transactions. Although the size of the offering, the number and relationship of the offerees, and the manner in which the offering is made are factors which may be considered in determining whether the offering is public or private, . . . these are simply criteria which are helpful in arriving at the ultimate determination of whether the purchasers or offerees require the protection of the Act. . . .

*SEC v. Universal Major Indus. Corp.*, 546 F.2d 1044, 1047–48 (2d Cir. 1976), *cert. denied*, 434 U.S. 834, 98 S.Ct. 120, 54 L.Ed.2d 95 (1977).

In the case at hand, the two offerees whom Tomlin approached did not require the protection of Section 5. Both King Grant–the only offeree besides defendants–and defendants Gayno, Gaylord, and Noble were able to "fend for themselves." There

is no evidence in the record that the Tomlin shares were offered, or will be offered, by any party to a person or class of persons in need of a registration statement pursuant to the Securities Act of 1933. Ironically, not only did the defendant offerees have access to the information which a registration would disclose, but also, plaintiff alleges, defendants had, in addition, confidential information regarding one of plaintiff's mines.

Moreover, nothing in the record suggests that Tomlin or the other defendants have purchased shares with a view to a public offering. Quite to the contrary, plaintiff alleges that the defendants intend to acquire more shares in a take–over attempt, rather than intending to make a public offering of the shares they now hold. Thus, it can hardly be said that defendants are "underwriters" within the meaning of the Securities Act of 1933. In short, Tomlin has correctly argued that no damage or injury has been caused by the alleged misrepresentations: "Since all offerees of the option shares in the chain from Standard to the present holders were proper private placees, capable of fending for themselves and without the need for the protection which the 1933 Act registration would provide, and since no purchaser in that chain was an 'underwriter' as defined in the Act, the sale of the shares from Standard to Tomlin was exempt as a 'transaction by an issuer not involving any public offering' and the resale by Tomlin to the Gaylord defendants did not either itself violate the Act or cause Standard to violate the Act."

■ Plaintiff has alleged another theory of injury–that Tomlin's misrepresentation induced plaintiff to issue the shares and that the issuance itself constitutes injury or damage. Plaintiff's issuance of the shares to Tomlin can hardly constitute injury or damage to plaintiff, since Tomlin had a contractual right to purchase the shares from plaintiff at the option price, pursuant to a signed agreement between plaintiff and Tomlin. It is well–established that a purchasing party's misrepresentations or omissions are irrelevant where the selling

party is obliged to sell its shares. *Ryan v. J. Walter Thompson Co.,* 453 F.2d 444, 447 (2d Cir. 1971), *cert. denied,* 406 U.S. 907, 92 S.Ct. 1611, 31 L.Ed.2d 817 (1972); *see Fershtman v. Schectman,* 450 F.2d 1357, 1360 (2d Cir. 1971), *cert. denied,* 405 U.S. 1066, 92 S.Ct. 1500, 31 L.Ed.2d 796 (1972); *Keating v. BBDO Int'l Inc.,* 438 F.Supp. 676, 681–82 (S.D.N.Y.1977). Whatever deficiencies or misrepresentations there were in Tomlin's disclosure could not have affected plaintiff, for plaintiff had the legal obligation to sell the shares at the predetermined price. *Kerrigan v. Merrill Lynch, Pierce, Fenner & Smith, Inc.,* 450 F.Supp. 639, 646 (S.D.N.Y.1978). Absent any intention or action on Tomlin's part to purchase the shares and redistribute them in violation of the Securities Act of 1933, plaintiff appears to have had no legal choice but to honor its contractual obligations to Tomlin and issue the shares upon exercise of the option. Plaintiff was obligated to fulfill its contractual commitments to Tomlin when on March 13, 1980, Tomlin paid the exercise price and delivered his undertaking not to violate the Securities Act of 1933. Accordingly, the mere issuance of shares by plaintiff cannot constitute damage or injury causally related to Tomlin's alleged misrepresentations.

In summary, the court concludes that plaintiff has failed to show any of the elements necessary to obtain a preliminary injunction against Tomlin.

*Plaintiff's Rule 10b–5 Claims Against the Gaylord Defendants*

■ Plaintiff alleges that it has standing to bring Rule 10b–5 claims against the Gaylord defendants, in connection with both the Tomlin transaction and certain purchases by the Gaylord defendants on the open market. With respect to the open market purchase, a plaintiff may not maintain a private cause of action for money damages under Rule 10b–5 where the plaintiff has neither purchased nor sold any of the offered shares. *Blue Chip Stamps v. Manor Drug Stores,* 421 U.S. 723, 95 S.Ct. 1917, 44 L.Ed.2d 539 (1975). The Second Circuit has steadfastly refused to extend

the reach of Rule 10b–5 to give standing to an issuer. *GAF Corp. v. Milstein,* 453 F.2d 709, 721 (2d Cir. 1971), *cert. denied,* 406 U.S. 910, 92 S.Ct. 1610, 31 L.Ed.2d 821 (1972). While the Second Circuit has stopped short of a holding that under no circumstances can an issuer have standing to seek an injunction, the case at hand does not fall within any of the situations in which the Second Circuit has refrained from foreclosing the possibility that an issuer might have standing under Rule 10b–5. *Id.* at 722 & n.27. *But see Brascan Ltd. v. Edper Equities Ltd.,* 477 F.Supp. 773, 792 (S.D.N.Y. 1979). Moreover, since plaintiff has standing under Section 13(d) in the case at hand, there is no compelling reason to open the door to plaintiff to bring the broad range of fraud actions which are cognizable under Rule 10b–5. *Id.* at 722. *Accordingly, the court concludes that plaintiff does not have standing to bring a Rule 10b–5 claim against the Gaylord defendants based on any open market transactions.*

■ Plaintiff was a seller in the Tomlin transaction, however, and plaintiff does have standing to bring a Rule 10b–5 claim against the Gaylord defendants based on the Tomlin transaction. Plaintiff alleges that the Gaylord defendants induced, and participated in, Tomlin's alleged Rule 10b–5 violation. It is well–established that defendants may be subject to a Rule 10b–5 claim if they participate in, aid or abet, or conspire in a Rule 10b–5 violation. In the case at hand, however, plaintiff has not shown a probability of success on the merits of its Rule 10b–5 claim against Tomlin. It goes without saying that plaintiff has also failed to show a probability of success on the merits of its claim that the Gaylord defendants induced or participated in a Rule 10b–5 violation by Tomlin. In summary, the court concludes that plaintiff's Rule 10b–5 claims against the Gaylord defendants do not warrant a preliminary injunction.

*Plaintiff's Section 13(d) Claim Against the Gaylord Defendants*

Plaintiff alleges that the Gaylord defendants violated Section 13(d) of the Securities

Exchange Act of 1934, 15 U.S.C. § 78m(d), when the Gaylord defendants filed a Schedule 13D on May 7, 1980, which failed to make a complete and accurate disclosure of a number of material facts. In particular, plaintiff argues that the May 7, 1980, Schedule 13D falsely represents that the Gaylord defendants have purchased shares of plaintiff for investment purposes.

Plaintiff alleges that, contrary to the representations in the May 7, 1980, Schedule 13D, the Gaylord defendants have been engaged in an overall scheme to enrich themselves by gaining control over plaintiff and by then placing properties which they own into plaintiff for shares of plaintiff's stock. Plaintiff argues that defendants Gaylord and Noble have used the borrowing power of Oklahoma Publishing to amass a considerable block of shares of plaintiff. Plaintiff notes that Gaylord could give no cogent reason why plaintiff was the sole mining company chosen for investment by Oklahoma Publishing, or why Gaylord chose, without first reporting to Oklahoma Publishing's board of directors, to purchase millions of dollars of plaintiff's non–dividend, highly speculative stock.

Despite the seriousness of plaintiff's charges against the Gaylord defendants, the court concludes that plaintiff has failed to show sufficient possible irreparable injury which would warrant a preliminary injunction against the Gaylord defendants. It is beyond dispute that a showing of possible irreparable injury is necessary before plaintiff can obtain injunctive relief in the case at hand. In *Rondeau v. Mosinee Paper Corp.*, 422 U.S. 49, 95 S.Ct. 2069, 45 L.Ed.2d 12 (1975), the Supreme Court held that a showing of irreparable harm is necessary for a private litigant to obtain injunctive relief in a suit under Section 13(d) of the Securities Exchange Act of 1934.

In *Rondeau*, the Court observed that the purpose of the Williams Act is to insure that public shareholders who are confronted by a tender offer will not be required to respond without adequate information regarding the qualifications and intentions of the offering party. *Id.* at 58, 95 S.Ct. at 2075. The Court noted that the defendant in that case had not attempted to obtain control of the company; "[m]oreover, he has now filed a proper Schedule 13D, and there has been no suggestion that he will fail to comply with the Act's requirement of reporting any material changes in the information contained therein." *Id.* at 59, 95 S.Ct. at 2076 [footnote omitted]. Accordingly, the Court concluded that there was no likelihood that shareholders would be disadvantaged in a tender offer or that the company would be unable to adequately place its case before the shareholders should a contest for control develop. *Id.*

The *Rondeau* Court also noted that persons who allegedly sold at an unfairly depressed price had an adequate remedy at law by way of an action for damages. *Id.* at 60, 95 S.Ct. at 2076. Thus injunctive relief would be inappropriate since injunctive relief is historically designed to deter, not to punish. *Id.* at 62–63, 95 S.Ct. at 2078. In short, the Court in *Rondeau* concluded that plaintiffs in a Section 13(d) action would not be relieved of the burden of showing irreparable harm and the other usual prerequisites for injunctive relief.

The *Rondeau* holding has been further explained by this court in *Treadway Cos. v. Care Corp.*, 490 F.Supp. 660 (S.D. N.Y. 1980). In *Treadway*, the court held that injunctive relief is available under Section 13(d) only to the extent of insuring that the information currently provided is accurate, so that shareholders and potential investors have reliable information upon which to act in the future. Thus, to the extent that prior filings may have been false or misleading, the appropriate remedy would be an action for damages brought by a buyer or seller of stock who had relied on the prior filings, not an action brought by the issuer for an injunction.

In the case at hand, the court is of the view that plaintiff has failed to show possible irreparable injury or false statements in the most recent Schedule 13D of the Gaylord defendants. Plaintiff has erroneously construed the court's denial of defendants' motion to dismiss plaintiff's claim

for a preliminary injuction at the close of plaintiff's case at the preliminary injunction hearing. At that time, the court merely held that there were sufficient facts and circumstances from which the court *could* find a nondisclosure in the most recent Schedule 13D, and accordingly possible irreparable injury. The court thus found it inappropriate to terminate the hearing at that time. The court did *not*, however, intend to suggest that it would necessarily agree with plaintiff's allegation of possible irreparable injury when the court reconsidered the record and issued its findings of fact and conclusions of law. Such a "promise" by the court at the close of plaintiff's case would obviously be premature. The court merely ruled that, as a matter of law, the evidence was sufficient so that the court could make a finding of possible irreparable injury, not that the court necessarily *would* make such a finding.

Plaintiff correctly observes that possible irreparable harm may result from a continued failure to disclose statutorily required information. *See General Aircraft Corp. v. Lampert*, 556 F.2d 90, 96–97 (1st Cir. 1977). However, in the case at hand, plaintiff's theory that the most recent Schedule 13D fails to disclose a scheme to enrich the Gaylord defendants is mere speculation. As will be discussed in greater detail below, it requires a rather strained exercise of imagination to infer from the present record a secret scheme by the Gaylord defendants to seize control over plaintiff in order to cause plaintiff to purchase the Cimarron properties. Plaintiff's speculation is especially suspect in light of the fact that there has been no tender offer or proxy solicitation by the Gaylord defendants, or even any evidence of the existence of any plans for engaging in such activities.

Moreover, the most recent Schedule 13D filed by the Gaylord defendants is sufficient to place shareholders and potential investors on notice as to any possibility of a change in corporate control. The May 8, 1980, Schedule 13D states:

> Although no plan presently exists to acquire control of the issuer, the group's collective intention to influence the issuer's policies and management may be deemed to constitute an intention to exercise "control."

. . . . .

> The persons comprising this group have also considered, but have not decided, whether or not to seek representation on the Board of Directors of the issuer, or to engage in a proxy solicitation to elect or oppose the election of directors of the issuer. . . .

To the extent that this latest Schedule 13D may not be fully accurate, if plaintiff's allegations are true, legal remedies are adequate to rectify any harm which might have occurred. If the directors or officers of plaintiff approve an exchange of shares for plaintiff's Cimarron properties, and if those properties are worthless and the exchange disastrous for plaintiff as alleged, then injured stockholders may always bring an action for damages arising out of the breach of fiduciary duty by the participating officers or directors.

This entire scenario, however, reveals the truly speculative nature of plaintiff's allegation of possible irreparable injury. In order to accept this theory, the court would be forced to assume, with little or no basis in the record, that: 1) the Gaylord defendants will make a tender offer or proxy solicitation sometime in the future; 2) the Gaylord defendants will be successful in gaining control of plaintiff; 3) the directors or officers of plaintiff will then allow the Gaylord defendants to exchange Cimarron properties for plaintiff's stock; and 4) plaintiff's shareholders will be injured by the property exchange. Both on its face and when viewed in light of the record before the court, plaintiff's theory is overly speculative and does not constitute a showing of possible irreparable injury. Thus, plaintiff's motion for a preliminary injunction must be denied, with respect to the Gaylord defendants.

■ Plaintiff's motion for a preliminary injunction against the Gaylord defendants must also be denied for failure to show

"either (1) probable success on the merits *or* (2) sufficiently serious questions going to the merits to make them a fair ground for litigation *and* a balance of hardships tipping decidedly toward the party requesting the preliminary relief." While there are serious questions going to the merits in this action, the court is of the view that plaintiff has failed to show a balance of hardships tipping decidedly in its favor. As discussed above, plaintiff has failed to show possible irreparable injury arising out of the most recent Schedule 13D. Moreover, the Gaylord defendants would suffer severe hardships from the injunctive relief requested by plaintiff. A preliminary injunction enjoining the Gaylord defendants from voting their stock would constitute a hardship. Plaintiff suggests that the injunction will not impose a hardship upon the Gaylord defendants if they do not intend to gain control of plaintiff. Plaintiff's suggestion is wholly without merit, as it would trivialize the voting interests of stockholders in companies not subject to take–over attempts. A preliminary injunction enjoining the Gaylord defendants from acquiring plaintiff's stock or from soliciting any proxies to vote plaintiff's stock would also constitute an unfair hardship, especially in light of the full disclosure by the Gaylord defendants in their most recent Schedule 13D that they have an intention to influence plaintiff's policies and that they may seek representation on the board of directors. To grant a preliminary injunction under such circumstances would unfairly provide plaintiff's management with a weapon to discourage take–over bids, contrary to the purpose of Section 13(d). In short, plaintiff has not shown a balance of hardships tipping decidedly in its favor.

Finally, the court must turn to the issue of whether plaintiff has satisfied the second prong of the preliminary injunction standard by showing probable success on the merits. The court concludes that plaintiff has failed to show probable success on the merits against the Gaylord defendants. In particular, plaintiff has failed to show probable success on the merits with respect to the alleged false statements in the Gaylord defendants' most recent Schedule 13D.

The most important material inaccuracy alleged by plaintiff is the failure of the most recent Schedule 13D to disclose that the Gaylord defendants formed a group in order to put properties into plaintiff, in exchange for stock for the personal benefit of defendants Gaylord and Noble. The court is of the view that plaintiff has not shown a probability of success on this issue. Central to the court's view is the fact that after a meeting in August, 1979, to discuss a possible exchange involving the Cimarron properties, defendant Noble never followed through on the proposed exchange. Regardless of who first suggested the possible exchange, the fact that Noble did not contact plaintiff's president following the August, 1979, meeting and did not exhibit any interest in the exchange is persuasive evidence that there exists no secret scheme over the years to exchange the Cimarron properties. Noble's testimony denied that Noble had any interest in an exchange of Noble's interest in Cimarron Coal for plaintiff's stock. Defendant Gaylord's testimony also characterized an exchange of Cimarron Coal properties for plaintiff's stock as a "poor trade." While plaintiff may be able to present at trial persuasive evidence of the alleged secret scheme, such evidence has not been offered to the court thus far.

Plaintiff also alleges that the most recent Schedule 13D fails to disclose that the Gaylord defendants formed a group as early as December, 1977. As an initial matter, the court is of the view that the present record does not show a probability of success on this issue. As defendants note, the different, and at times inconsistent, trading patterns of the various defendants cast serious doubt upon any contention of a concerted effort since 1977 to seize control of plaintiff. More importantly, even assuming that a group was formed in 1977, injunctive relief would not seem warranted since the most recent Schedule 13D discloses the existence of a group, thus rendering the

group's date of formation relatively immaterial.

The other alleged inaccuracies in the most recent Schedule 13D also do not suggest a probability of success on the merits for plaintiff. With respect to Item 2 of the Schedule 13D, plaintiff raises a number of objections which might charitably be characterized as "quibbles." When reasonably viewed as a whole, Item 2 satisfactorily discloses the identity and background of the Gaylord defendants.

With respect to Item 3 of the Schedule 13D, plaintiff alleges that the Gaylord defendants failed to disclose that stock purchases were financed by a series of loans and other transactions. In effect, plaintiff argues that the Oklahoma Bank was somehow the source of financing for the Gaylord defendants' purchasers of plaintiff's stock. Plaintiff's theory is directly contrary to testimony that no borrowings were made by Oklahoma Publishing for purchases of plaintiff's stock. While plaintiff recites a complicated series of transactions in an attempt to show that the ultimate source of all the funds was the Oklahoma Bank, plaintiff overlooks the fact that a Schedule 13D need only disclose borrowing for the purpose of acquiring stock. A number of the transactions referred to by plaintiff involve pre–existing debts, not debts incurred for the purpose of acquiring plaintiff's stock. The Gaylord defendants cannot be deemed to have violated Section 13(d) by failing to disclose information for which disclosure was not required. Plaintiff's argument on this point sweeps much too broadly and, in effect, would require listing on a Schedule 13D of every creditor of a filing party. While the issues and transactions involved are complicated, the court is unwilling to hold at this time that plaintiff has shown a probability of success on the merits of this point.

Finally, with respect to Items 5 and 6 of the Schedule 13D, plaintiffs allege a failure to disclose a variety of material facts relating to the Tomlin transaction. Plaintiff's claims appear to rely, to a large extent, upon the alleged Rule 10b–5 violation by Tomlin which is discussed above. For the purposes of the Schedule 13D, the Tomlin transaction would appear to be satisfactorily disclosed. The Schedule 13D describes Tomlin's exercise of his option, discloses the fact that the shares were unregistered, and discloses the fact that Gayno assigned 12,000 of the shares to Gaylord. The relationship of Gaylord and Noble to Gayno is also disclosed. While plaintiff may be unhappy with various aspects of the Tomlin transaction, plaintiff has not shown a probability of success on the merits in its attempt to show material inaccuracies in the Schedule 13D description of the transaction.

On the present motion for preliminary injunction, the court need not, and indeed cannot, analyze in detail each and every one of the numerous objections raised by plaintiff to the most recent Schedule 13D filed by the Gaylord defendants. The court is satisfied, however, that on the present record plaintiff has failed to show a probability of success on the merits with respect to the alleged Section 13(d) violation by the Gaylord defendants. Of course, the court expresses no view as to whether plaintiff may be able to offer additional evidence at trial which will result in success on the merits. The court need only rule that the present record does not show probability of success.

*Conclusion*

For the reasons stated above, the court concludes that plaintiff's motion for a preliminary injunction must be denied.